IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| Survitec Group Ltd.; | § | |
| Survitec Survival Products, Inc.; | § | |
| Survitec Safety Solutions US LLC; | § | |
| Survitec Service & Distribution Ltd.; RFD | § | |
| Beaufort, Inc.; and | § | CIVIL ACTION NO. 4-21-cv-312 |
| Deutsche Schlauchboot GmbH, | § | |
| *Plaintiffs*, | § | |
| | § | |
| v. | § | Hon. Judge Lee H. Rosenthal |
| | § | |
| Fire Protection Service, Inc., | § | |
| *Defendant*. | § | |

**DEFENDANT FIRE PROTECTION SERVICE INC.'S**
**AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

In accordance with the Court's Order directing the parties to file any Amended Proposed Findings of Fact and Conclusions of Law on or before August 28, 2025, Defendant Fire Protection Service, Inc. ("FPS") submits the below Amended Proposed Findings of Fact and Conclusions of Law:

**FINDINGS OF FACT**

1.      The "Trademarks-in-Suit" are SURVITEC, SURVIVA, RFD, OCEANMASTER, CREWSAVER, ELLIOT, DSB, SURVITECZODIAC, SURVITEC SURVIVAL PRODUCTS, and REVERE.

2.      Plaintiff Survitec Survival Products Inc. ("SSPI") does not own or control any of the Trademarks-in-Suit [ECF. 179, 185, 195, 201, 210, 214, 154, 145; Def. Ex. 5, 11, 21, 27, 36, 40, 61; Pl. Ex. 111, 105.]

3.      SSPI does not manufacture any good bearing any of the Trademarks-in-Suit.

4.      SSPI does not provide any life raft service, inspection, repair, or re-certification

services.

5.      The DSB and DSB & Design marks are used by DSB Deutsche Schlauchboot G.m.b.H [ECF. 185; Def. Ex. 11.]

6.      DSB Deutsche Schlauchboot G.m.b.H. does not hold a United States trademark registration for any mark.

7.      DSB Deutsche Schlauchboot G.m.b.H. does not hold the exclusive right to use the marks DSB or DSB & Design in the United States [ECF. 185; Def. Ex. 11.]

8.      DSB Deutsche Schlauchboot G.m.b.H. does not sell any goods in the United States.

9.      DSB Deutsche Schlauchboot G.m.b.H. does not provide any services in the United States.

10.     DSB Deutsche Schlauchboot G.m.b.H. does not exercise any control or authority over the operations or use of the entities that use the DSB and DSB & Design marks in the United States.

11.     DSB Deutsche Schlauchboog G.m.b.H. does not inspect or certify service facilities in connection with the repair, inspection, or re-certification of life rafts bearing any mark.

12.     The DSB and DSB & Design marks are not distinctive in the United States for any goods or services offered by DSB Deutsche Schlauchboot G.m.b.H.

13.     ELLIOT and CREWSAVER marks are used by RFD Beaufort, Inc. [ECF. 195, 201; Def. Ex. 21, 27.]

14.     ELLIOT is the subject of U.S. Registration No. 3408716 for inflatable life rafts. [ECF. 195; Def. Ex. 21.]

15.     RFD Beaufort, Inc. does not exercise any control or authority over the operations or use of the entities that use the ELLIOT mark in the United States.

16.    RFD Beaufort, Inc. does not inspect or certify service facilities in connection with the repair, inspection, or re-certification of life rafts bearing any mark.

17.    CREWSAVER is the subject of U.S. Registration No. 1085948 for inflatable life rafts. [ECF. 201; Def. Ex. 27.]

18.    RFD Beaufort, Inc. does not exercise any control or authority over the operations or use of the entities that use the CREWSAVER mark in the United States.

19.    RFD Beaufort, Inc. does not sell any goods in the United States.

20.    RFD Beaufort, Inc. does not provide any services in the United States.

21.    The REVERE SURVIVAL PRODUCTS mark is owned by Revere Survival, Inc. [ECF. 210; Def. Ex. 36.]

22.    No Plaintiff owns a registration for the trademark REVERE.

23.    No Plaintiff holds the exclusive right to use the trademark REVERE in the United States.

24.    No Plaintiff offers any services under the trademark REVERE.

25.    The trademark REVERE is not distinctive in the United States for any goods or services offered by any of Plaintiffs.

26.    Revere Survival, Inc. is not owned by, controlled by, or affiliated with, any of Plaintiffs.

27.    FPS is authorized to use the "REVERE SURVIVAL PRODUCTS & Design" trademark by the original equipment manufacturer ("OEM") of the goods sold under that trademark [ECF. 83-1, 83-2, 83-3; Pl. Ex. 1-3.]

28.    FPS is authorized to service, inspect, and recertify life rafts bearing the "REVERE SURVIVAL PRODUCTS & Design" trademark [ECF. 83-1, 83-2, 83-3; Pl. Ex. 1-3.]

*Defendant's Amended Proposed Findings*
*of Fact and Conclusions of Law*    *Case No. 4:21-cv-0312*

29.     RFD, SURVIVA, SURVITEC, BEAUFORT, and SURVITECZODIAC marks are owned by Survitec Group Ltd. ("SGL"). [ECF. 179, 214, 154, 145; Def. Ex. 5, 40; Pl. Ex. 111, 105].

30.     RFD is the subject of U.S. Registration No. 1860741 for life rafts and parts and fittings therefore. [ECF. 179; Def. Ex. 5.]

31.     SURVIVA is the subject of U.S. Registration No. 5631105 for life rafts. [ECF. 214; Def. Ex. 40.]

32.     SURVITEC is the subject of U.S. Registration No. 7292953 for Life-rafts; life jackets; life preservers for babies; marine evacuation systems comprised of marine evacuation slides and escape chutes; anti-g suits; life buoys; armoured life jackets; survival waistcoats for the prevention of drowning and for the carrying of survival and rescue equipment; floatation collars; water immersion protection garments, namely, waterproof survival suits for the prevention of drowning and hypothermia; survival suits; liquid cooling vests for safety and protection against thermal radiation; garments for protection against chemicals and nuclear radiation; garments for protection against radiation; fire retardant combat clothing, namely, clothing for protection against fire; head and neck restraint devices for protection against accidents, namely, protective head guards and protective neck guards; submarine escape suits and submarine escape jerkins; parachute oxygen systems comprised of aviation oxygen masks and oxygen regulators; hyperbaric oxygen chambers for non-medical purposes; life support systems for aircraft comprised of aircraft respiratory masks for the prevention of accident and injury and oxygen regulators; protective industrial respiratory masks for aircraft; wave energy converters for converting marine wave energy to electrical energy; insulated clothing jackets for protection against injury from the cold; Overalls; cold weather clothing, namely, coats, trousers, suits, hats, gloves; extreme weather

clothing not for protection against accident or injury, namely, balaclavas, suits, coats, trousers, hats, gloves; winter clothes, namely, winter suits, winter coats, winter trousers, winter hats, winter boots and outdoor gloves; clothing jackets for the protection against the cold other than for protection against accident or injury; footwear; fire retardant combat clothing not for protection against accident or injury, namely, suits, trousers and jackets treated with fire and heat retardants; Repair or maintenance of life saving apparatus and equipment; servicing, modification and repair of life-rafts and fire extinguishers; servicing, modification and repair of marine evacuation systems including marine evacuation slides and chutes; servicing, modification and repair of breathing apparatus, except for artificial respiration, and compressors; installation of life rafts, marine escape equipment, fire extinguishers and breathing equipment. [ECF. 154; Pl. Ex. 111.]

33.    SURVITEC was registered in the United States on January 30, 2024. [ECF. 154; Pl. Ex. 111.]

34.    SGL does not hold a United States trademark registration for the mark BEAUFORT.

35.    SGL does not hold a United States trademark registration for the mark SURVITECZODIAC.

36.    SGL does not hold the exclusive right to use the marks BEAUFORT or SURVITECZODIAC in the United States.

37.    SGL does not sell any goods in the United States.

38.    SGL does not provide any services in the United States.

39.    SGL does not exercise any control or authority over the operations or use of the entities that use the RFD, SURVIVA, or SURVITEC & DESIGN, BEAUFORT, or SURVITECZODIAC marks in the United States.

40.    The BEAUFORT and SURVITECZODIAC marks are not distinctive in the United States for any goods or services offered by SGL.

41.    The OCEANMASTER and SURVITEC SURVIVAL PRODUCTS marks are owned by Survitec Survival Solutions (US) LLC ("SSS"). [ECF. 235; Def. Ex. 61.]

42.    OCEANMASTER is the subject of U.S. Registration 4891403 for life rafts [ECF. 235; Def. Ex. 61.]

43.    SSS does not exercise any control or authority over the operations or use of the entities that use the OCEANMASTER mark in the United States.

44.    SSS does not hold a United States trademark registration for the mark SURVITEC SURVIVAL PRODUCTS.

45.    SSS does not hold the exclusive right to use the mark SURVITEC SURVIVAL PRODUCTS in the United States.

46.    SSS does not sell any goods in the United States.

47.    The SURVITEC SURVIVAL PRODUCTS mark is not distinctive in the United States for any goods or services offered by SSS.

48.    SSS provides service, inspection, repair, and re-certification of life rafts bearing the Trademarks-in-Suit, from its location in Pasadena, Texas.

49.    Survitec Service & Distribution Ltd. does not own or control any of the Trademarks-in-Suit.

50.    Following the August 2017 termination letters, Survitec subsidiaries continued to do business with FPS and contracted to inspect and service the life rafts branded with the Trademarks-in-Suit. [ECF. 189, 216, 217, 218, 219, 220, 221; Def. Ex. 15, 42-47.]

51.    Following the August 2017 termination letters, Survitec subsidiaries expressed an

*Defendant's Amended Proposed Findings of Fact and Conclusions of Law*    *Case No. 4:21-cv-0312*

affirmative desire to continue to do business with FPS, even before the termination was effective. [ECF. 189; Def. Ex. 15]

52.    Plaintiffs notified FPS's customers that FPS was no longer an authorized service facility for Plaintiffs' purported brands [ECF. 196; Def. Ex. 22.]

53.    FPS resells the maritime safety products of OEM's, including Revere and Viking [ECF. 203; Def. Ex. 29.]

54.    FPS services, inspects, and recertifies life rafts of third-party manufacturers where it has authorization and certifications to do so, and contracts with third-party servicers, inspectors, and certifiers—including Survitec's subsidiaries—when it does not [ECF. 197, 198, 199, 200; Def. Ex. 23-26.]

55.    FPS notified customers of the need to subcontract life rafts it was not authorized to service [ECF. 222; Def. Ex. 48.]

56.    Plaintiffs engaged in a plan to notify FPS's customers that it was no longer authorized to service life rafts branded with the Trademarks-in-Suit [ECF. 193; Def. Ex. 19.]

57.    Plaintiffs informed FPS's customers that FPS was no longer authorized to service life rafts branded with the Trademarks-in-Suit [ECF. 196; Def. Ex. 22.]

58.    FPS did not perform inspections or service life rafts it was not authorized to inspect or service.

59.    The sub-contracted commercial life raft service, inspection, repair, and re-certification services offered by FPS to its customers are genuine services rendered by service providers authorized by the OEM's, including by Survitec's subsidiaries. [ECF. 216, 217, 218, 219, 220, 221, 222; Def. Ex. 42-48.]

60.    FPS's customers receive valid and authentic Certificates of Re-Inspection which

identify the authorized service facility which serviced, inspected, and recertified its life rafts. [ECF. 233; Def. Ex. 59.]

61.    These Certificates of Re-Inspection are purchased by authorized service facilities directly from the OEM's, including Plaintiffs.

62.    The Certificates of Re-Inspection are formatted in a standardized manner by the United States Coast Guard.

63.    The Certificates of Re-Inspection are required by law.

64.    The Certificates of Re-Inspection express the name of the entity that did the servicing.

65.    The conveyance or delivery of a Certificate of Re-Inspection purchased and completed by an authorized servicer bearing an OEM's trademark is not a commercial use of that trademark.

66.    The conveyance or delivery of a Certificate of Re-Inspection purchased and completed by an authorized servicer to a customer is not trademark infringement.

67.    FPS services, inspects, repairs, and re-certifies life rafts on a contract basis for other servicers, inspectors, and certifiers—including SSS—when those companies do not have authorization or certification to do so at their own facilities [*see, e.g.,* ECF. 203; Def. Ex. 29.]

68.    SSS regularly contracted FPS to inspect and service life rafts of Survitec competitors like Viking [*see, e.g.,* ECF. 203; Def. Ex. 29.]

69.    In at least one instance, SSS requested FPS replace a life raft bearing one of Plaintiffs' trademarks with a life raft manufactured by its competitor Viking [ECF. 203; Def. Ex. 29.]

70.    On September 17, 2017, approximately one month after the delivery by SGL of the

*Defendant's Amended Proposed Findings of Fact and Conclusions of Law*    *Case No. 4:21-cv-0312*

termination notices, Frank Palomba, an executive within SGL, reauthorized FPS to purchase equipment and inventory from Plaintiffs [ECF. 189; Def. Ex. 15.]

71.    Plaintiffs never told FPS to stop buying maritime safety products, to stop providing contract services to SSS, or to stop contracting with SSS for the inspection, repair, and re-certification of life rafts manufactured under the Trademarks-in-Suit.

72.    Third-party servicers, such as Alexander Ryan, Donovan Marine, Triad Marine, and SSS were all aware that FPS was using them to subcontract life rafting services.

73.    Such third-party servicers would provide FPS discounts on subcontracted services as compared to what a customer would be quoted [ECF. 207; Def. Ex. 33]

74.    SGL group counsel Julian Henley-Price ("Mr. Henley-Price") had the authority to direct FPS's service suppliers Triad Marine, Alexander-Ryan, and Donovan Marine to stop providing sub-contracted services to FPS on behalf of FPS's customers.

75.    Mr. Henley-Price learned that FPS was sub-contracting service, inspection, repair, and re-certification services to Triad Marine, Alexander-Ryan, Donovan Marine, and SSS on or about October 20, 2020.

76.    From the time he learned about FPS's sub-contracting activities in October 2020 to the time of trial, Mr. Henley-Price never instructed SSS or any third-party service facility to stop providing services to FPS for the benefit of FPS's customers in connection with life rafts branded with the Trademarks-in-Suit.

77.    At no time between October 2020 and the date of trial did Mr. Henley-Price direct any person to instruct SSS or any third-party service facility to stop providing service to FPS for the benefit of FPS's customers in connection with life rafts branded with the Trademarks-in-Suit.

78.    Plaintiffs never told FPS stop contracting with third-parties authorized to service,

inspect, repair and recertify life rafts branded with the Trademarks-in-Suit.

79.    FPS's customers were free to accept or reject prices quoted by FPS for subcontracted life raft services.

80.    FPS was not bound by any Distribution Agreement, Service Agreement, or any other document that would have expressly or impliedly restricted its ability to sub-contract life raft service, repair, inspection, or re-certification to authorized service facilities.

81.    FPS was not bound by any Distribution Agreement, Service Agreement, or any other document through which it agreed to disclose to Plaintiffs that it was sub-contracting life raft service, repair, inspection, or re-certification services to authorized service facilities.

82.    FPS was not bound by any Distribution Agreement, Service Agreement, or any other document through which it agreed to disclose to its customers that it was sub-contracting life raft service, repair, inspection, or re-certification services to authorized service facilities.

83.    FPS has no control over the U.S. Coast Guard ("USCG") website or the CGMIX Service Facilities List ("CGMIX"), and has no responsibility to actively monitor the USCG website or contact USCG's website administrators about the information published on its website [ECF. 176; Def. Ex. 2.]

84.    The OEM of a life raft brand maintains the responsibility of notifying the USCG of stations doing unauthorized work, per the Code of Federal Regulations.

85.    Plaintiffs did not notify the USCG of any unauthorized services as required under the Code of Federal Regulations.

86.    Following the termination letters, Plaintiffs did not notify the USCG that FPS was no longer authorized to service life rafts bearing the Trademarks-in-Suit.

87.    The only trademarks Plaintiffs complained of on the first page of FPS's brochure

and line sheet were SURVITEC SURVIVAL PRODUCTS, ELLIOT, DSB, and REVERE [Def. Demonstrative Ex. 1.]

88.     The first page of FPS's brochure and line sheet included the marks RFD-TOYO and RFD SURVIVA which Mr. Mark Hansen testified were not the subject of Plaintiffs' Complaint [Def. Demonstrative Ex. 1.]

89.     The first page of FPS's brochure and line sheet includes more than fifty (50) other trademarks which are not involved in this litigation, including competitors of Plaintiffs [ECF. 178; Def. Ex. 4.]

90.     The second through the fifth pages of FPS's brochure and line sheet include several trademarks, none of which are the Trademarks-in-Suit [ECF. 178; Def. Ex. 4.]

91.     The sixth page of FPS's brochure and line sheet includes the mark SURVITEC SURVIVAL PRODUCTS and REVERE among twenty-two (22) other trademarks which are not involved in this litigation, including competitors of Plaintiffs [ECF. 178; Def. Ex. 4.]

92.     The seventh page of FPS's brochure and line sheet included the marks DSB, ELLIOT, and REVERE along with the mark of Plaintiffs' competitor Viking and the statement "**FPS is the only Viking Services Station in Texas**" [ECF. 178; Def. Ex. 4.]

93.     At the time the brochure and line sheet was published, FPS was an authorized service facility and dealer of the goods branded with the Trademarks-in-Suit [ECF. 178; Def. Ex. 4.]

94.     At the time this suit was initiated in January 2021, FPS's website listed one hundred twenty-seven (127) marks, including the SURVITEC mark twice in connection with the sale of goods [ECF. 83-9; Pl. Ex. 9.]

95.     FPS's use of the Trademarks-in-Suit on its brochure and line sheet did not indicate

an affiliation, authorization, or sponsorship of FPS from the OEM's of the goods sold under the respective trademarks [ECF. 178; Def. Ex. 4.]

96.    FPS's use of the Trademarks-in-Suit on its website and line sheet did not indicate an affiliation, authorization, or sponsorship of FPS from the OEM's of the goods sold under those marks [ECF. 178; Def. Ex. 4.]

97.    FPS's use of the Trademarks-in-Suit on its brochure and line sheet described genuine goods and genuine services provided by FPS or at FPS's direction [ECF. 178; Def. Ex. 4.]

98.    Plaintiffs knew or should have known of FPS's use of the Trademarks-in-Suit on its brochure and line sheet since at least as early as January 2018.

99.    When he authorized SGL to continue to do business with FPS, Franck Palomba told Tim Hazen, FPS's account manager, to make sure FPS was not misusing its trademarks.

100.    In its August 2017 termination letters, SGL agreed to re-purchase the inventory FPS had purchased from it and its OEM's, but it never did [ECF. 178; Def. Ex. 41.]

101.    Between August 2017 and April 2019, FPS tried to negotiate a re-purchase with SSPI [ECF. 191; Def. Ex. 17.]

102.    SSPI took the position during the negotiations to buy-back FPS's inventory that the termination of authorization letter did not preclude FPS from selling the stock of life rafts bearing the various Trademarks-in-Suit to its customers [ECF. 191; Def. Ex. 17.]

103.    As of the date of trial FPS still has inventory and equipment from the OEM owners of the ELLIOT, DSB, REVERE, SURVIVA, and RFD trademarks.

104.    Plaintiffs knew or should have known of FPS's sub-contract servicing, inventory, and use of the Trademarks-in-Suit at the time SSPI removed FPS's lawsuit for violations of the Texas Fair Practices of Equipment Manufacturers, Distributors, Wholesalers, and Dealers Act

("the Act"), TEX. BUS. & COM. CODE § 57.001 *et seq.*to federal court on June 14, 2019.

105.    SSPI waited until January 31, 2021 to raise any trademark claim.

106.    SSPI waited until May 6, 2021 to serve its trademark complaint on FPS.

107.    SSPI knew it did not own any trademark registrations when it filed its claims for dilution, infringement of a registered trademark, infringement of a common law trademark, unfair competition, and counterfeiting against FPS.

108.    SSPI continued to prosecute multiple causes of action which require trademark ownership even though it knew it did not have any ownership rights in any trademark.

109.    SSPI's acts in continuing to pursue the trademark claims even though it was aware from the inception of its case that it held no rights constitutes bad faith.

110.    Plaintiffs' delay in filing a lawsuit alleging unfair competition, false designation of origin, and false advertising, and dilution in light of its knowledge of FPS's continued use of the Trademarks-in-Suit since as early as 2018, is unreasonable.

111.    Plaintiffs' statements to FPS regarding the ability of FPS to continue to offer and sell its existing inventory after the termination of authorization letter; its continued sales of OEM goods to FPS; and its continued servicing of FPS's customer's commercial life rafts bearing the Trademarks-in-Suit indicates Plaintiffs impliedly authorized FPS to use those trademarks in its business.

112.    FPS reasonably relied upon Plaintiff's statements and actions when it continued to include the SURVITEC, ELLIOT SURVITEC SURVIVAL PRODUCTS, DSB, and REVERE trademarks on its website and in its line sheet and brochure to advertise genuine goods and parts of the OEM's.

113.    FPS acted within a reasonable time following service of SSPI's trademark

infringement suit, which first provided FPS notice of SSPI's complaint, to remove the SURVITEC, ELLIOT SURVITEC SURVIVAL PRODUCTS, REVERE, and DSB trademarks from its brochure and line sheet and website.

114.    FPS acted within a reasonable time following notice by SSPI to request reinspection of its facilities by the U.S. Coast Guard to hasten the removal of the RFD, ELLIOT, CREWSAVER, and SURVITEC SURVIVAL PRODUCTS INC. trademarks from CGMIX.

115.    The following Trademarks-in-Suit were never used in connection with any advertising by FPS following SGL's termination of FPS as an authorized service and distribution facility: SURVIVA, RFD, SURVITECZODIAC, BEAUFORT, OCEANMASTER, or CREWSAVER [Def.'s Demonstrative Ex. 1.]

116.    The following Trademarks-in-Suit never appeared on CGMIX in connection with any FPS facility following SGL's termination of FPS as an authorized service and distribution facility: SURVITEC, SURVIVA, SURVITECZODIAC, BEAUFORT, OCEANMASTER, DSB, or REVERE [Def.'s Demonstrative Ex. 2.]

117.    None of the Trademarks-in-Suit are famous such that a large proportion of the consuming public recognizes any of them.

118.    None of the Trademarks-in-Suit are widely recognized by the public throughout the state of Texas as a designation of source of the goods or service of any of Plaintiffs.

119.    FPS provides commercial life raft service, inspection, repair, and re-certification services in Houston, Texas.

120.    FPS provides commercial life raft service, inspection, repair, and re-certification services in New Orleans, Louisiana.

121.    FPS provides commercial life raft service, inspection, repair, and re-certification

services in Corpus Christi, Texas.

122.    FPS is the only commercial life raft service, inspection, repair, and re-certification facility in Corpus Chrisi.

123.    SSS provides commercial service, inspection, repair, and re-certification services in Pasadena, Texas.

124.    None of Plaintiffs provides any service, inspection, repair, or re-certification services in Louisiana.

125.    With the exception of SSS, none of Plaintiffs advertise life raft service, inspection, repair, or re-certification services to consumers in Texas or Louisiana.

126.    FPS's failure to immediately remove certain of the Trademarks-in-Suit from its brochure, line sheet, and website was not done in bad faith.

127.    Plaintiffs presented no evidence of actual confusion.

128.    Consumers of FPS's sub-contracting and facilitation services for goods bearing the Trademarks-in-Suit knew or should have known that FPS was not directly providing the service, inspection, repair, and/or re-certification services [ECF. 222; Def. Ex. 48.]

129.    The transportation of life rafts for sub-contracting and service for goods bearing the Trademarks-in-Suit does not constitute a commercial use of those trademarks.

130.    The transportation of life rafts for sub-contracting and service for goods bearing the Trademarks-in-Suit is not trademark infringement.

131.    The Maritime Code, 46 C.F.R. § 160.151-3 defines "servicing" as "the periodic inspection, necessary repair, and repacking by a servicing facility approved by the United States Coast Guard."

132.    The transportation of life rafts to facilitate the service, inspection, repair, and/or re-

*Defendant's Amended Proposed Findings*    *Case No. 4:21-cv-0312*
*of Fact and Conclusions of Law*

certification of those life rafts is not regulated as a "service" by the United States Coast Guard under the Maritime Code.

133.    The return transportation of life rafts to a customer following authorized service, inspection, repair, and/or re-certification of those life rafts is not regulated as a "service" by the United States Coast Guard under the Maritime Code.

134.    Facilitating and engaging a third-party service supplier who is authorized by the OEM to service, inspect, repair, and/or recertify a life raft is not regulated as a "service" by the United States Coast Guard under the Maritime Code.

135.    Consumers of FPS's sub-contracting and facilitation services knew or should have known that they were being charged a mark-up by FPS to contract with third-party authorized service, inspection, repair, and re-certification facilities.

136.    FPS's mark-up for sub-contracting the third-party service, inspection, repair, and re-certification of its customers' life rafts is reasonable.

137.    Consumers of FPS's sub-contracting, facilitation, and authorized repair services are sophisticated such that they understand that FPS would charge a mark-up to sub-contract service, inspection, repair, and re-certification of goods branded with the Trademarks-in-Suit to authorized service facilities.

138.    The CGMIX is not a commercial website.

139.    The CGMIX is not intended to advertise or promote the services of any service facility.

140.    Customers using CGMIX to find a repair facility are required to contact the facility to confirm a facility's authorization to service, inspect, repair, and recertify certain OEM life rafts [ECF 176; Def. Ex. 2 at p. 45.]

141.    The CGMIX list is not guaranteed to be up-to-date.

142.    The USCG expressly disclaims any third-party reliance on the information it provides on CGMIX.

143.    One or more Trademarks-in-Suit appearing on CGMIX does not constitute a use-in-commerce by FPS.

144.    FPS did not use any of the SURVITEC, ELLIOT SURVITEC SURVIVAL PRODUCTS, or DSB trademarks in commerce following Plaintiffs' complaint about its brochure, line sheet, and website and FPS's subsequent removal of those advertisements from its website.

145.    Plaintiffs have not proven any injury caused by FPS's use of any Trademark-in-Suit.

146.    FPS did not use the registered trademark SURVITEC in commerce.

147.    FPS did not use the registered trademark SURVIVA in commerce.

148.    FPS did not use the registered trademark BEAUFORT in commerce.

149.    FPS did not use the registered trademark RFD in commerce.

150.    FPS did not use the registered trademark OCEANMASTER in commerce.

151.    FPS did not use the registered trademark CREWSAVER in commerce.

152.    FPS did not use the registered trademark ELLIOT intentionally as a calculated reproduction intended to deceive consumers in to thinking they were buying genuine products or purchasing genuine goods.

153.    FPS's uses of the Trademarks-in-Suit did not impact the distinctiveness of any of the brands they identify.

154.    FPS did not use any trademark, similar to or identical to the Trademarks-in-Suit, which, by its use, harmed the reputation of the mark owners.

155.    Plaintiffs presented no evidence of actual damages, including lost profits, lost business opportunities, or expenditures Plaintiffs made to mitigate any perceived reputational harm.

156.    Plaintiffs presented no evidence of a reduction in life raft sales or servicing.

157.    SGL has moved its customers to a service model called RaftXChange which is a rental and lease program resulting in fewer life raft sales, but more consistent revenues.

158.    SGL has moved customers to a service model called RaftXChange+ which is a rental and lease program for life rafts with extended service terms allowing customers to avoid paying to service life rafts branded by the Trademarks-in-Suit every year.

159.    Plaintiffs' disgorgement damages model is based on the assumption that FPS's sub-contracted life raft servicing constitutes trademark infringement.

160.    Plaintiffs did not demonstrate that customers would have gone to Plaintiffs but for FPS accepting the life rafts of its customers.

161.    Plaintiffs did not segregate their damages based on specific trademarks.

162.    Plaintiffs did not segregate their damages by Plaintiff.

163.    Plaintiffs did not identify any specific use of a trademark that resulted in their damages.

164.    Plaintiffs did not identify any specific advertising that led to the provision of FPS's sub-contracting services.

165.    Plaintiffs' disgorgement damage model identifies the value of an invoice delivered to FPS's customer and subtracts from it the value of the invoice sent to FPS from its authorized service supplier.

166.    Plaintiffs' disgorgement damage model does not account for non-regulated services

*Defendant's Amended Proposed Findings*
                                         *of Fact and Conclusions of Law*

provided by FPS to its customers.

167.    Plaintiffs' disgorgement damage model does not account for the discount provided to FPS from its authorized service suppliers.

168.    Plaintiffs' damages expert testified that he relied on Mr. Gerald Neilsen's report and, if Mr. Neilsen was found by the Court not to be a trademark expert, his testimony about damages would change.

169.    At trial, Plaintiffs did not know that OCEANMASTER is owned by SSS.

170.    At trial, Plaintiffs did not know that RFD is owned by SGL.

171.    At trial, Plaintiffs did not know that CREWSAVER is owned by RFD Beaufort.

172.    Plaintiffs do not control or manage the use of their own trademarks.

173.    A parent company and non-litigant named Survitec Group International, Ltd. enters into service and dealer contracts to enforce and control the Trademarks-in-Suit and manage them.

174.    All of the Trademarks-in-Suit are licensed to various companies to enforce on their behalf, including at various times SSPI, SGL, and Survitec Group International Ltd.

175.    Plaintiffs used this lawsuit as leverage to prevent FPS from appealing in 4:19-cv-2162.

176.    Plaintiffs used this lawsuit as leverage to seek a settlement which included the purchase of FPS.

177.    During the litigation, representatives of SGL contacted FPS to try to purchase FPS.

## CONCLUSIONS OF LAW

178.    Plaintiffs lack standing to assert claims for passing-off on behalf of FPS's service suppliers who knowingly provided authorized services in connection with goods bearing the Trademarks-in-Suit on FPS's behalf.

179.    Plaintiffs lack standing to assert claims for unfair competition or false advertising on behalf of consumers who knew or should have known that FPS was sub-contracting to authorized life raft service facilities, freely contracted for those services, accepted FPS's mark-ups, and did not complain to FPS.

180.    SSPI cannot maintain any Texas, Louisiana, or Federal Lanham Act claims for trademark infringement, unfair competition, or dilution because SSPI is not an owner of any of the Trademarks-in-Suit. *Fire Protection Serv., Inc. v. Survitec Survival Prods., Inc.*, No. 4:19-cv-2162, 2024-WL 29406098 (S.D. Tex. Jun. 11, 2024).

181.    Plaintiffs cannot maintain their Texas, Louisiana, or Federal Lanham Act claims for infringement, unfair competition, or dilution against FPS because each of the Trademarks-in-Suit have abandoned as a result of the Plaintiff-owners' naked licensing, failure to use, and failure to supervise and control the quality of their respective marks. *Moore Business Forms, Inc. v. Ryu*, 960 F.2d 486, 489 (5th Cir. 1992); *Hot-Hed, Inc. v. Safehouse Habitats (Scotland), Ltd.*, 333 S.W.3d 719, 730 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (citing *All Am. Builders, Inc. v. All Am. Siding of Dallas, Inc.*, 991 S.W.2d 484, 488 (Tex. App.—Fort Worth 1999, no pet.); *AutoZone IP LLC v. Awad*, No. 17-cv-13107, 2018 WL 6591910, at *3 (E.D. La. Dec. 12, 2018) (citing *Nola Spice Designs, LLC v. Haydel Enters., Inc.*, 969 F. Supp. 2d 688, 703 (E.D. La. 2013)).

182.    Plaintiffs cannot maintain their Texas, Louisiana, or Federal Lanham Act false designation of origin, false advertising, or trademark dilution claims against FPS because, to the extent FPS uses the Trademarks-in-Suit, it does so consistent with the nominative fair use doctrine. Specifically, FPS sells genuine products identified by the Trademarks-in-Suit and sub-contracts with authorized facilities to provide genuine servicing of life rafts identified by the Trademarks-in-Suit. *Scott Fetzer Co. v. House of Vacuums Inc.*, 381 F.3d 477 (5th Cir. 2004); *Hot-Hed, Inc. v.*

*Safehouse Habitats (Scotland), Ltd.*, 333 S.W.3d 719, 730 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (citing *All Am. Builders, Inc. v. All Am. Siding of Dallas, Inc.*, 991 S.W.2d 484, 488 (Tex. App.—Fort Worth 1999, no pet.); *AutoZone IP LLC v. Awad*, No. 17-cv-13107, 2018 WL 6591910, at *3 (E.D. La. Dec. 12, 2018) (citing *Nola Spice Designs, LLC v. Haydel Enters., Inc.*, 969 F. Supp. 2d 688, 703 (E.D. La. 2013)).

183.    Plaintiffs cannot maintain their Texas, Louisiana, or Federal Lanham Act false designation of origin, false advertising, or trademark dilution claims against FPS because, to the extent FPS uses the Trademarks-in-Suit, it does so consistent with the first sale doctrine. Specifically, Plaintiffs cannot exercise control over trademarks, including the Trademarks-in-Suit, appearing on genuine goods first sold into the stream of by or at the direction of Plaintiffs. *C.f. Sebastian Int'l, Inc. v. Longs Drug Stores Corp.*, 53 F.3d 1073, 1074 (9th Cir. 1995), *cert. denied*, 516 U.S. 914 (1995).

184.    As a matter of law, weighing the digits of confusion established in this Circuit, Plaintiffs failed to demonstrated that FPS's use of any Trademark-in-Suit, to the extent it was a commercial use, is likely to cause confusion, mistake, or deception as to the source, origin, or sponsorship of the goods and sub-contracting services with those of Plaintiffs. *Bd. of Supervisors for La. State Univ. Agric. & Mech. Coll. v. Smack Apparel Co.*, 550 F.3d 465 (5th Cir. 2008).

185.    Plaintiffs DSB Deutsche Schlauchboot G.m.b.H., RFD Beaufort, Inc., SGL, and SSS are barred from maintaining a cause of action under the Lanham Act for counterfeiting or dilution with respect to the marks DSB, DSB & Design, REVERE, BEAUFORT, SURVITECZODIAC, and SURVITEC SURVIVAL PRODUCTS they hold no registrations for the marks. 15 U.S.C. §§ 1114(1), 1116(d)(1)(B), 1125(c).

186.    Plaintiffs' claims complaining of FPS's use of the Trademarks-in-Suit, to the extent

it is a commercial use are barred by the doctrine of laches. *Armco, Inc. v. Armco Burglar Alarm Co.*, 693 F.2d 1155 (5th Cir. 1982); *Gulf, Colorado & Santa Fe Ry. Co. v. McBride,* 322 S.W.2d 492 (Tex. 1958).

187.    Plaintiffs' claims complaining of FPS's use of the Trademarks-in-Suit, to the extent it is a commercial use are barred by the doctrine of acquiescence. *Pennzoil-Quaker State Co. v. Miller Oil & Gas Operations*, 779 F.3d 290 (5th Cir. 2015).

188.    FPS's use of the Trademarks-in-Suit, to the extent such use was a commercial use, was subject to an implied license from Plaintiffs, barring their Texas, Louisiana, and Lanham Act claims. *Exxon Corp. v. Oxxford Clothes, Inc.*, 109 F.3d 1070, (5th Cir. 1997) (citing *McCoy v. Mitsuboshi Cutlery, Inc.,* 67 F.3d 917, 920 (Fed.Cir.1995)).

189.    Plaintiffs act of terminating FPS, accepting FPS's sub-contracting services through SSS, and then suing FPS for infringement of the same sub-contracting services when they were not offered to SSS to attempt to recover sub-contracting fees paid by third-parties to FPS for genuine authorized services is an improper use of Plaintiffs trademarks against FPS. Further, Plaintiffs' suit is intended to chill legitimate commercial speech and suppress legitimate market competition through the enforcement of its trademarks. These two facts together constitute trademark misuse as a matter of law.

190.    Because Plaintiffs came to the Court with unclean hands and filed and prosecuted their trademark claims against FPS in bad faith and with the knowledge that (1) they were not viable due to its lack of ownership; (2) they were not viable due to a lack of registration; (3) Plaintiffs communicated to FPS that it was allowed to continue to sell goods under the Trademarks-in-Suit; (4) Plaintiffs sought out and provided servicing, inspection, and re-certification services to FPS's customers with goods bearing the Trademarks-in-Suit; and (5) because the Court has

found Plaintiffs have misused the Trademarks-in-Suit, the Court finds this is an exceptional case under Section 35(a) of the Lanham Act, 15 U.S.C. § 1117(a), and awards reasonable attorney's fees to FPS as the prevailing party.

191.    Based on the facts, and the foregoing conclusions of law, this case is deemed exceptional pursuant to 15 U.S.C. § 1117 and FPS, as the prevailing party, is entitled to its reasonably attorney's fees for defending against Plaintiffs' trademark infringement allegations.

Dated:  August 28, 2025                     Respectfully submitted,

                                            By:    /s/ Justen S. Barks
                                                Justen S. Barks
                                                State Bar No. 24087142
                                                SDTX:2295553
                                                **BARKS PLLC**
                                                5005 Riverway Dr., Ste. 250
                                                PO Box 22171
                                                Houston, TX 77227
                                                jbarks@barks.law
                                                Tel.: 832-416-1642

                                                Scott Matney
                                                Attorney-in-charge
                                                State Bar No. 24010747
                                                SDTX: 23671
                                                PO Box 5218
                                                Houston, TX 77262
                                                smatney@fps-usa.com
                                                Main: 713-924-9600
                                                Direct: 713-924-9617
                                                Fax: 713-924-9651

                                                **ATTORNEYS FOR FIRE
                                                PROTECTION SERVICES INC.**

## CERTIFICATE OF SERVICE

I hereby certify that on July 28, 2025, a true and correct copy of the foregoing DEFENDANT'S AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW was served on all counsel and *pro se* parties through the Court's CM/ECF platform in conformity with the Federal Rules of Civil Procedure and L.R. 5.


_____/s/ Justen S. Barks_____
Justen S. Barks