United States District Court
Southern District of Texas
**ENTERED**
September 30, 2025
Nathan Ochsner, Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| SURVITEC SURVIVAL PRODUCTS, INC., *et al.*, | § § § | |
| Plaintiffs, | § | CIVIL ACTION NO. H-21-312 |
| v. | § § | |
| FIRE PROTECTION SERVICE, INC., | § § | |
| Defendant. | § § | |

**FINDINGS OF FACT & CONCLUSIONS OF LAW**

Survitec Group Ltd. is the parent of a large group of corporate entities, including some that make maritime survival equipment, such as life rafts. Fire Protection Service, Inc. sells and services this kind of equipment. Beginning in the 1970s, Fire Protection and some Survitec entities operated under an oral agreement allowing Fire Protection to use Survitec-entity trademarks, trade names, and brand names and to serve as a dealer and servicer of Survitec-branded products. Survitec Group Ltd. terminated that agreement in 2017 after it acquired a Houston company that serviced life rafts and could compete with Fire Protection and similar companies in the Houston area. Fire Protection had filed an earlier action asserting claims against Survitec Survival Products, Inc., a subsidiary of Survitec Group Ltd., under the Texas Dealer Protection Act. *Fire Prot. Serv., Inc. v. Survitec Survival Prods., Inc.*, No. H-19-2162 (S.D. Tex.). That case remains pending after remand from the Fifth Circuit.

In this lawsuit, Survitec Group Ltd. and some of its subsidiaries, (collectively, "the plaintiffs"), allege that Fire Protection continued to use its trademarks without authorization, in violation of Texas and Louisiana law and the Lanham Act, 15 U.S.C. § 1051 *et seq*. The parties

cross-moved for summary judgment, (Docket Entry Nos. 50, 58), but the court carried the motions with the case after concluding that the evidence and legal issues were best resolved on a more complete record, (Docket Entry No. 62). The parties waived their rights to a jury trial and agreed to a bench trial. From August 11, 2025, to August 14, 2025, the parties tried the case before the court. After considering the evidence and testimony presented at trial; their motions for summary judgment and responsive briefs; their proposed findings and conclusions; and the applicable law, the court finds and concludes that the plaintiffs failed to prove each of the counts in their Second Amended Complaint. (Docket Entry No. 47; *see also* Docket Entry No. 76 (Joint Pretrial Order)). Accordingly, the court enters judgment in favor of Fire Protection.

The court's findings of fact and conclusions of law are set forth below.[1]

## I.    Findings of Fact

"Survitec" is shorthand for a group of related corporate entities, including the plaintiffs in this action: Survitec Group Ltd.; Survitec Survival Products, Inc.; Survitec Safety Solutions US LLC; Survitec Service & Distribution Ltd.; RFD Beaufort, Inc.; and Deutsche Schlauchboot GmbH. (Docket Entry No. 76 at 1). The plaintiffs' corporate representative, Mark Hansen, the sales director for Survitec Group Ltd., testified that Survitec Group International, Ltd., a non-party, was the ultimate parent company. (8/11 Tr. at 86:12–87:1; 8/12 AM Tr. at 47:21–24; *see also* Docket Entry No. 252 at 19 (Fire Protection's proposed findings)). Julian Henley-Price, the general counsel of Survitec Group Ltd., (8/13 AM Tr. at 58:17–19), testified that he was "the general counsel to all group companies," (*id.* at 46:17–25). He clarified that Survitec Group International Ltd. is a subsidiary company that contracts with stations that service Survitec-

---

[1] To the extent any of the conclusions of law are findings of fact, they should be considered findings of fact. To the extent any of the findings of fact are conclusions of law, they should also be considered conclusions of law.

branded life rafts. (*Id.* at 53:18–54:13). The plaintiffs' organizational chart identifies Survitec Group Ltd. as the parent company of the other plaintiff-entities, including Survitec Group International, Ltd. (Pl. Ex. 122). Survitec Group Ltd. is the parent company of the plaintiffs in this case.

Fire Protection Service, Inc. has operated since 1952. The Bradley family has owned and operated it since 1975. (8/14 AM Tr. at 29:10–30:15). Fire Protection offers safety-related equipment and services to a variety of maritime businesses and for land-based commercial and industrial work. (*Id.* at 31:21–32:25). Fire Protection's equipment includes fire-suppression systems, fire-safety suits, respiratory protection, and other fire-rescue goods for fire departments or oil-and-gas companies. (*Id.*). Shane Bradley, Fire Protection's general manager, is one of the company's principal officers and testified as its corporate representative at trial. (*Id.* at 30:23–31:10). He controls much of the company's operations, procedure, sales, and accounting. (*Id.*). His sister is also part of Fire Protection's management team, handling the company's human-resource and insurance responsibilities. (*Id.* at 29:10–30:15). Cheryl Bradley, Shane's mother, owns the company. (8/11 Tr. at 38:11–14).

From the 1970s until August 2017, Fire Protection was an authorized dealer for some of Survitec Group Ltd.'s subsidiaries. (*Id.* at 38:15–21). The parties operated under an oral agreement. Survitec Group Ltd., on behalf of its member companies, agreed that Fire Protection could serve as an authorized dealer and servicer for its branded life rafts on an "at will" basis. (Docket Entry No. 76 at 18 (stipulated facts); *see also* 8/12 AM Tr. at 58:17–61:18).

In August 2017, Survitec Group Ltd. emailed three termination letters to Shane Bradley at Fire Protection. (Pl. Ex. 1; Pl. Ex 2; Pl. Ex. 3). Survitec Group Ltd. sent these letters because Fire Protection was the exclusive service station for Viking, another life-raft manufacturer that

3

competes with Survitec, and Survitec was concerned that Fire Protection would steer its customers toward Viking products. (8/11 Tr. at 41:12–14, 78:14–79:25, 98:14–24, 106:10–23; 8/12 AM Tr. at 77:18–22). Survitec Group Ltd. had also purchased Wilhelmsen Maritime Services AS, a company that provided safety-related services similar to those Fire Protection offers. (8/11 Tr. at 97:7–98:5). Through that purchase, Survitec Group Ltd. acquired a life-raft service facility in Pasadena, Texas. (*Id.* at 97:7–98:13; *see also* 8/13 PM Tr. at 4:14–20).

Survitec's termination letters demanded that Fire Protection "cease using all trademarks, trade names and brand names of Survitec and its group companies," with each notice listing a different, but overlapping, group of trademarks. (Pl. Ex. 1 at 1; Pl. Ex 2 at 1; Pl. Ex. 3 at 1). The first letter discussed marks related to "DSB, Elliot, Revere, RFD, RFD-Toyo, SSP, and TOYO," (Pl. Ex. 1 at 1); the second letter discussed marks related to "DSB, Elliot, Revere, RFD and SSP," (Pl. Ex. 2 at 1); and the third letter discussed marks related to "DSB, Reverse, RFD and SSP," (Pl. Ex. 3 at 1). The first and third letters allowed Fire Protection to continue using these companies' marks until December 27, 2017, but prevented Fire Protection from servicing or selling Survitec-branded life rafts and equipment after that date. (Docket Entry No. 76 at 18 (stipulated facts); 8/12 AM Tr. at 55:8–56:11).[2] The letters did not prohibit Fire Protection from accepting Survitec-branded life rafts needing service or repairs and sending the rafts to a certified third party to do the work. Nor did the letters require Fire Protection to inform customers that it was outsourcing service and repair work to certified third parties.

Survitec Group Ltd.'s termination letters also discussed three individual technicians at Fire Protection that serviced Survitec-branded rafts and equipment. (*See* Pl. Ex. 1 at 1; Pl. Ex. 3 at 1).

---

[2] The second letter was effective immediately because no Survitec-certified technicians worked at Fire Protection's Corpus Christi location, where the letter was directed. (Docket Entry No. 76 at 18 (stipulated facts); Pl. Ex. 2).

To service life rafts, both the U.S. Coast Guard and the equipment manufacturer—in this case, a Survitec entity—must certify the servicing technician. *See* 46 C.F.R. § 160.151-39 (establishing training-program requirements for servicing technicians); *id.* § 160.151-37 (establishing the requirements of the servicing manual that manufacturers must create for technicians); (*see also* 8/11 Tr. at 94:10–97:6 (describing the training and certification requirements to service Survitec-branded rafts)). The certifications of two Fire Protection technicians, Oscar San Miguel and Curtis Grant, were set to end in August 2017, the same month that Survitec Group Ltd. sent the termination letters, but Survitec Group Ltd. extended their certifications through the December 2017 termination date. (Pl. Ex. 1 at 1; Pl. Ex. 3 at 1; 8/12 AM Tr. at 51:9–53:12). Survitec Group Ltd. immediately terminated the certifications of a third technician, Anthony Rodriguez. (Pl. Ex. 1 at 1; 8/12 AM Tr. at 18:5–24).

Fire Protection tried to sell its inventory of Survitec-branded products during the pre-termination period, including working to facilitate the repurchase of that inventory by Survitec Survival Products, a company that had transferred its assets to Survitec Safety Solutions in 2021. (8/12 AM Tr. at 62:10–63:4; 8/13 AM Tr. at 60:4–14). Survitec's standard practice is to repurchase leftover inventory from terminated dealers. Survitec Survival Products planned to repurchase the Survitec-branded equipment in Fire Protection's inventory. (8/12 AM Tr. at 57:2–58:12; 8/13 AM Tr. at 69:8–14). However, Survitec Survival Products delayed in doing so, including by waiting until December 2018 to issue Fire Protection a return authorization. (Def. Ex. 6; 8/12 AM Tr. at 64:2–71:11; 8/12 PM Tr. at 54:6–55:16, 59:22–61:24). Because of Survitec's delay, and because Survitec's termination letters forbade Fire Protection from selling its Survitec-branded inventory to third parties after the termination date, some of the inventory expired in Fire Protection's possession. (8/11 Tr. at 79:3–12, 81:11–82:15; 8/12 AM Tr. at 18:25–

5

19:13, 55:25–58:12). Survitec Group Ltd. and its subsidiaries acknowledge that, "looking back," Fire Protection "would have been able to sell" its inventory of Survitec-branded parts and equipment, (8/12 AM Tr. at 56:15), except for the fact that Survitec's termination letters erroneously stated that Fire Protection could not do so, (*see* 8/12 AM Tr. at 55:8–58:12, 77:10–79:13; 8/12 PM Tr. at 56:5–58:18). The parties agree that under the first-sale doctrine, Fire Protection could resell genuine Survitec goods bearing true Survitec marks that Fire Protection had purchased before the termination. (8/12 AM Tr. at 72:13–16). Had Survitec Group Ltd. not prohibited Fire Protection from selling its Survitec-branded inventory in the termination letters, or if Survitec Survival Products purchased its branded equipment in Fire Protection's inventory, Fire Protection could have recovered value on that inventory. Some of Fire Protection's inventory could not be sold after Survitec's prohibition ended because it no longer met the Coast Guard's regulatory requirements. (*See, e.g.*, Def. Ex. 6; 8/11 Tr. at 79:3–15; 8/12 AM Tr. at 64:2–68:23; 8/12 PM Tr. at 56:5–18)

After the December 2017 termination, Fire Protection and Survitec-branded entities maintained commercial relationships. Survitec Survival Products filled orders from Fire Protection for the resale of safety equipment other than life rafts, such as personal flotation devices. (8/12 AM Tr. at 76:3–79:7; Def. Ex. 15). Survitec Survival Products and Survitec Safety Solutions, the entities that operated the service station in Pasadena, Texas, also worked with Fire Protection to service life rafts for the entities' customers. (Def. Ex. 26 at 2; 8/12 PM Tr. at 28:21–24). Those Survitec entities serviced life rafts for some of Fire Protection's customers. (Pl. Ex. 26; 8/12 PM Tr. at 47:9–21; *see also* 8/13 PM Tr. at 4:4–8). And Fire Protection serviced some third-party-branded life rafts for Survitec when, for example, customers approached Survitec Safety Solutions with Viking rafts that were subject to an exclusive servicing arrangement with

Fire Protection. (*See, e.g.*, Def. Ex. 29; *see also* 8/13 AM Tr. at 81:18–82:21). Survitec Group Ltd. terminated Fire Protection's ability to sell, rent, or service Survitec-branded life rafts and equipment.

After its termination as a licensed Survitec dealer, Fire Protection continued to assist customers who needed Survitec-branded life rafts serviced by subcontracting the servicing work to certified third-party servicers, including Triad Marine & Industrial Supply, Inc., Alexander/Ryan Marine & Safety Co., and Donovan Marine, Inc. (8/13 PM Tr. at 4:9–5:9, 7:17–8:17). Fire Protection would accept orders to service customers' life rafts; outsource the service work to a certified subcontractor; and return the life raft to the customer with an invoice that included all the work. (*See* 8/11 Tr. at 66:10–20; 8/13 PM at 4:9–7:14, 8:6–9:7; Def. Exs. 42–48; *see also* 8/12 PM Tr. at 28:21–30:2; 8/13 AM Tr. at 82:22–83:6). In some of these transactions, Fire Protection notified its customers that it was no longer a Survitec-authorized service station and that it was outsourcing the service work on the customers' rafts. (8/11 AM Tr. at 50:8–10). Survitec Safety Solutions also notified a Fire Protection customer on at least one occasion that it had terminated Fire Protection's service authorization. (*Id.* at 74:4–11, 115:9–15). Survitec did not demand that Fire Protection stop outsourcing life-raft servicing work for Survitec-branded rafts to other stations in the Houston area or, before this lawsuit, demand that Fire Protection disclose to its customers that it was outsourcing the service work on Survitec-branded life rafts. (*Id.* at 115:23–116:7; 8/13 PM Tr. at 5:10–6:19; *see also* 8/13 PM Tr. at 92:13–20 (argument, not evidence)).

Fire Protection also continued to associate with the plaintiffs' brands in limited respects after the termination. First, Fire Protection created a brochure and line sheet that it used at trade shows and posted to its website:



(Pl. Ex. 8; *see also* Pl. Ex. 9; Pl. Ex. 44; Def. Ex. 4; 8/12 AM Tr. at 86:7–25).  Fire Protection had

created the brochure and line sheet and posted them to its website before the termination.  Fire

Protection removed them in January 2021, when a Survitec representative notified Fire Protection

that they were still accessible online.  (8/11 Tr. at 45:20–23).  Fire Protection also continued to use

its pre-termination stock of printed brochures at trade shows after termination, until it ran out of

brochures sometime in 2020.  (*Id.* at 70:24–73:12).

The line sheet is a single page showing marks of over fifty brands for which Fire Protection

offers some good or service.  (Pl. Ex. 8; 8/12 AM Tr. at 87:1–88:13; 8/12 PM Tr. at 5:5–9:3).  On

that crowded sheet, Fire Protection included marks for Survitec Survival Products and its affiliates,

Elliot, Deutsche Schlauchboot, and Revere.  (8/12 PM Tr. at 5:5–9:16; Pl. Ex. 8).  Fire Protection's several-page brochure displays the information conveyed in the line sheet and the marks for Survitec Survival Products, Elliot, Deutsche Schlauchboot, and Revere, along with those of about twenty-two other brands.  (Pl. Ex. 9 at 5–7; 8/12 PM Tr. at 9:4–12:11).  The line sheet and brochure show many marks without in any way highlighting or emphasizing the Survitec marks.

Second, Fire Protection's website displayed lists of domestic and international products that it sells.  (Pl. Ex. 10).  These lists include no identifiable brand imaging but rather describe in plain text the names of the manufacturers whose products that it offers for sale.  An example is set out below:

> **Safety Equipment:**
> • Akron – Angus Fire – Ansul – Datrex – Draeger – JALITE – Imperial – MSA – Ocenco – Revere – Survitec - Viking

(Pl. Ex. 10 at 1).  Of the 127 brands listed on the website, Revere and Survitec are the only allegedly infringing references.  (*Id.*; *see* 8/12 PM Tr. at 16:4–20:6).  Fire Protection updated its website in January 2021 to remove these references.  (*See* 8/11 Tr. at 45:20–23; 8/12 AM Tr. at 11:17–12:8; Pl. Ex. 1).

Third, the U.S. Coast Guard continued to list Fire Protection as an authorized servicer of Survitec-branded products after the termination.  The Coast Guard regulates the manufacture, service, and inspection of life rafts, including the facilities that inspect and service life rafts.  46 C.F.R. § 160.151-47, .151-49.  It maintains a public list of all regulated service facilities along with the manufacturers whose products each facility is certified to service.  *Id.* § 160.151-51.  Before Survitec terminated Fire Protection as an authorized dealer and service provider, the Coast

Guard's website had listed Fire Protection as an authorized service station for life rafts manufactured by RFD, Elliot, Crewsaver, and Survitec Survival Products.



(Pl. Ex. 45; *see also* Def. Ex. 55). The Coast Guard did not update this listing after Survitec terminated Fire Protection as an authorized dealer. (*See* Pl. Ex. 45 (listing its last update as February 7, 2022)). However, the Coast Guard website included a disclaimer stating that the Coast Guard is not liable for "any reliance on its [website's] accuracy, completeness, or timeliness." (8/13 PM Tr. at 71:4–72:10). No party told the Coast Guard to update its website until Fire Protection did so in April 2023, when the plaintiffs amended their complaint to include allegations of Fire Protection's association with Survitec brands on the Coast Guard's website. (8/13 AM Tr. at 75:2–7, 80:7–20). The Coast Guard updated its webpage in May 2023, about one month after

Fire Protection contacted officials to advise them that the webpage should be updated.  (8/11 Tr. at 45:24–47:13; 8/13 AM Tr. at 75:2–7).

Fire Protection interacted with Survitec-branded marks in some additional, miscellaneous ways.  When Fire Protection shipped customers' rafts to authorized service stations, the Survitec marks were on the life rafts, and Fire Protection's name was on the transporting vehicles.  (8/12 PM Tr. at 12:12–13:7).  And when Fire Protection's subcontractors returned the Survitec-branded life rafts after servicing them, the certificates that were required by federal regulations included the Survitec entities' marks as the manufacturer.  (8/11 Tr. at 55:14–57:7).  The federal regulations require the certificates to follow a certain format and to identify the manufacturer of the life raft. 46 C.F.R. § 160.151-57(p); (*see* 8/11 Tr. at 57:2–7; 8/12 AM Tr. at 16:5–17:6, 23:12–24:9). The regulations also require that the certificates identify the facility that had serviced the life raft. *See* 46 C.F.R. § 160.151-57(p)(7) (requiring the "identification of the servicing facility, including its name, address, and the approval code assigned by the Commandant"); (8/12 AM Tr. at 15:9–16, 23:12–24:9).

Combining the evidence presented at trial with the plaintiffs' allegations results in the following chart, which demonstrates Fire Protection's association with the allegedly infringed marks after the termination:

| Allegedly Infringed Mark | Brochure & Line Sheet | Fire Protection Website | Coast Guard Website |
|---|---|---|---|
| SURVITEC | | x | |
| SURVIVA | | | |
| RFD | | | x |
| OCEANMASTER | | | |
| CREWSAVER | | | x |
| ELLIOT | x | x | x |
| BEAUFORT | | | |
| DSB | x | x | |
| SURVITECZODIAC | | | |

| Allegedly Infringed Mark | Brochure & Line Sheet | Fire Protection Website | Coast Guard Website |
|---|---|---|---|
| SURVITEC SURVIVAL PRODUCTS | x | x | x |
| REVERE | x | x | |

(Def. Dem. Ex. 1; Def. Dem. Ex. 2; 8/12 PM Tr. at 4:12–26:9).

Fire Protection's limited use of Survitec marks after the termination did not harm the plaintiffs. There is no evidence that Fire Protection's limited post-termination use of the plaintiffs' marks caused customers to choose it to service life rafts, including Survitec-branded rafts, instead of choosing the Survitec service station in the Houston area. There is no evidence that Fire Protection's limited post-termination use caused customer confusion that adversely affected the plaintiffs' business or good will. In short, the plaintiffs showed no harm and no damages caused by Fire Protection's limited post-termination use of Survitec's marks.

The plaintiffs called two witnesses to testify that they thought Fire Protection was still an authorized service station after the termination: Kara Babb, an employee of Ocean Ridge Litigation Support and former employee of Savage Marine, a Fire Protection customer, (8/13 PM Tr. at 15:11–16:20); and Brian Bertram, who works for the Coastal Fisheries Division of the Texas Parks & Wildlife Department, (8/13 AM Tr. at 22:8–23:2). Neither witness's testimony persuades the court that Fire Protection's limited use of the Survitec marks caused any economic or other harm to the plaintiffs.

Babb testified that her former employer, Savage Marine, used Fire Protection to service its Survitec-branded life rafts; that she did not know that Fire Protection outsourced the servicing work; and that she assumed Fire Protection serviced the life rafts itself because federal regulations require the manufacturer's certification to service life rafts. (8/13 PM Tr. at 15:11–22:9). The

court accords Babb's testimony, given as a paid fact witness, little weight.[3]  (*See id.* at 22:12–19).

Babb did not testify that Fire Protection's use of the plaintiffs' marks confused her; rather, she

testified that she simply assumed Fire Protection was an authorized service dealer doing the service

work itself because it accepted Savage Marine's request to service Survitec-branded life rafts, not

because Fire Protection used, much less infringed, any of the plaintiffs' trademarks.  (*Id.* at 20:2–

16).  And Babb did not explain her reason for assuming that Fire Protection did not outsource any

of its servicing work.  That assumption was unreasonable.  The record shows that subcontracting

is a normal part of the industry.  (Def. Exs. 29, 42–48; 8/11 Tr. at 100:24–101:22; *see also* 8/13

AM Tr. at 81:18–82:21).  Subcontracting could occur because a given service provider has limited

capacity, because a ship requires a faster turnaround on raft servicing than a particular raft service

station can provide, because a manufacturer has an exclusive servicing arrangement with a

particular raft service station, or because a manufacturer does not certify a particular entity as an

authorized service provider.

Babb's testimony that she did not know that Fire Protection outsourced service work on

Survitec-branded rafts lacks credibility for another reason.  As part of her job, Babb reviewed

certificates of servicing, which identify the entity that serviced a life raft.  She reviewed the

certificates that Fire Protection returned.  (8/13 PM Tr. at 27:3–32:13).  Those certificates showed

that Fire Protection had outsourced Savage Marine's service work on Survitec-branded rafts to an

authorized, third-party service provider.  (*Id.*).  Other Savage Marine employees, such as the port

engineer and captain, who actually retained Fire Protection to service their vessels' life rafts, also

had the service certificates available to review.  (*Id.* at 23:11–24:12, 32:10–13).  Babb also testified

---

[3] The plaintiffs initially retained Babb as an expert but proffered her at trial only as a fact witness.  (8/13 PM Tr. at 9:22–15:8).

that although she would have liked to know that Fire Protection outsourced servicing work on Survitec-branded rafts, she had no complaints about the quality of Fire Protection's work or the price it charged. (*Id.* at 32:15–33:19).

Babb did not credibly testify to any facts that would support an inference that her assumption harmed the plaintiffs. After Babb's tenure ended, Fire Protection told Savage Marine employees that it had to outsource some of their requests for life-raft servicing, and the employees continued to use Fire Protection to service Savage Marine's rafts. (*Id.* at 26:5–19; *see* Pl. Ex. 60). Babb explained that Fire Protection provided Savage Marine's life rafts with appropriate service at a fair market price. (8/13 PM Tr. at 32:15–33:19). Fire Protection did not retain Savage Marine as a customer by not disclosing that it subcontracted the servicing of Savage Marine's Survitec-branded life rafts.

Bertram testified to similar facts. Betram supervised the Texas Parks & Wildlife Department employees who authorized the purchase of life-raft service work from Fire Protection. (8/13 AM Tr. at 25:3–15). Bertram's division uses inflatable life rafts on its research vessels. (*Id.* at 23:12–24:11). Bertram testified that he did not know that Fire Protection outsourced its servicing of Survitec-branded life rafts to third parties, such as Triad Marine. (*Id.* at 28:23–25). Bertram explained that, if he had known that Fire Protection outsourced the life-raft servicing, he might have sought another service provider. (*Id.* at 30:12–17). Again, this testimony deserves little weight.

First, Bertram lacked personal knowledge of the transactions with Fire Protection; he explained that his technicians coordinated the life-raft servicing with Fire Protection. (*Id.* at 33:13–34:16). Second, Bertram did not testify that Fire Protection's limited use of the plaintiffs' marks caused his assumption that Fire Protection was doing the service work itself, rather than

14

outsourcing.  He testified only that he assumed Fire Protection completed the service itself because it accepted his team's request.  (*Id.* at 28:23–29:17).  But Bertram also testified that Fire Protection told one of his technicians that it had to ship the Texas Parks & Wildlife rafts to a different facility for servicing.  (*Id.* at 34:3–16).  Bertram testified that he simply assumed that Fire Protection was shipping the life rafts to another Fire Protection facility, not a third party, but he could not rule out the possibility that Fire Protection had told the technician that it was subcontracting the servicing work.  (*Id.*).  In any event, the possibility that Fire Protection outsourced its life-raft servicing did not cause Bertram to look for other service providers; his division consistently used Fire Protection to service its life rafts.  (*Id.* at 34:17–35:5).  Again, there was no complaint about the quality or price of the service work that Fire Protection arranged.  (*Id.* at 31:15–32:9).

The preponderance of the credible evidence shows that customers would not have switched away from using Fire Protection to service their Survitec-branded life rafts even if they knew that Fire Protection was outsourcing the life-raft servicing work.  No witness, aside from some assertions by the plaintiffs' corporate officers, disputes that Fire Protection's customers were happy with the quality of the service that Fire Protection arranged and that Fire Protection charged its customers a price that they paid without complaint.  (8/12 PM at 103:16–108:18; 8/13 AM Tr. at 31:19–32:9; 8/13 PM Tr. at 32:15–33:19).

The record shows that customers choose a raft-service provider for a variety of reasons. Fire Protection was the only local service station in Corpus Christi.  (8/12 AM Tr. at 10:18–11:16). Ships often face a short period between docking and their next voyage, creating the need for tried-and-true service providers that can service or repair life rafts in a short timeframe.  (*Id.*).  In addition, many customers' vessels often have life rafts and other safety equipment from multiple manufacturers and are unlikely to use multiple service providers to avoid outsourcing service work

15

on life rafts from a single manufacturer. (*See* 8/13 AM Tr. at 18:9–20). For example, Fire Protection is an exclusive Viking service provider; another service entity asked to work on a Viking raft would have to outsource that work to Fire Protection. (8/11 Tr. at 41:12–14). For these and other reasons, customers may not be able or willing to switch to a different raft-service provider even if they know they could directly contract with a certified servicer. Based on a review of the entire record, and weighing the credibility of the testimony, the court finds no evidence that customers used Fire Protection to service their Survitec-branded life rafts because of Fire Protection's limited use of Survitec's marks. Nor does the court find evidence that customers would have stopped using Fire Protection to service their Survitec-branded life rafts if Fire Protection had disclosed that it was subcontracting the service or repair work on those rafts.

Finally, the plaintiffs have failed to prove that they were damaged by Fire Protection's limited use of their marks or by Fire Protection's subcontracting life-raft service work. Even if some customers would have stopped using Fire Protection if they knew that Fire Protection was subcontracting its servicing work on Survitec-branded rafts, there is no credible evidence that those customers would have chosen a Survitec-owned service station to do the work. The customers could have chosen any other Survitec-authorized—but not Survitec-owned—service station. (*See* 8/12 PM Tr. at 101:15–102:23; 8/13 PM Tr. at 7:17–8:17). There is no evidence that Survitec lost customers or work because Fire Protection did not disclose that it was outsourcing work on Survitec-branded rafts.

Nor is there any evidence of damage to the plaintiffs' brand image or goodwill from Fire Protection's failure to disclose that it was outsourcing service work on Survitec-branded rafts. The plaintiffs do not object to Fire Protection's subcontracting service work on Survitec-branded life rafts; they object only to Fire Protection's failure to disclose to customers that it was subcontracting

16

the work.  (8/11 Tr. at 100:24–101:9, 118:11–119:4; 8/12 AM Tr. at 8:6–9:11, 11:17–14:17).  The plaintiffs did not point to any legal basis for imposing this disclosure requirement on Fire Protection.  They did not point to any basis to find that Fire Protection infringed Survitec's trademark by accepting work on Survitec-branded rafts without disclosing to customers that it was not an authorized service station.  And they did not point to any evidence that they were damaged by Fire Protection's failure to do so.

Survitec's theory of how Fire Protection's failure to disclose that it was subcontracting service work on Survitec-branded rafts caused Survitec harm is that the failure to disclose might give customers the impression that Survitec-branded rafts are expensive.  (See 8/12 AM Tr. at 7:6–17).  Survitec neither presented nor points to evidence to support this theory.  The evidence showed that Fire Protection delivered its customers a quality service at a price they paid without any evidence of complaints.  After Survitec terminated Fire Protection as an authorized dealer, Fire Protection could accept work from customers wanting their Survitec-branded rafts serviced as long as Fire Protection did not itself do the service work.  Fire Protection was not required to disclose that it was outsourcing that work.  And, as noted above, the plaintiffs did not introduce any credible evidence or testimony that they lost customers or business after Survitec Group Ltd. terminated Fire Protection as an authorized servicer because Fire Protection did not disclose that it outsourced servicing work on Survitec-branded rafts.  Nor did the plaintiffs show that their sales or service work would have been greater had Fire Protection completely severed all associations with the plaintiffs' marks after termination.  The record demonstrates no injury caused by Fire Protection's actions or omissions that the plaintiffs challenged.

## II.        Conclusions of Law

The plaintiffs asserted various business-tort claims under federal, Texas, and Louisiana law: (1) unauthorized trademark use; (2) trademark dilution; (3) false designation of origin, including reverse passing off; and (4) false or misleading advertising.  (Docket Entry No. 47 at 20–42).  The plaintiffs bring these claims as to the following marks: SURVITEC; SURVIVA; RFD; OCEANMASTER; CREWSAVER; ELLIOT; DSB; BEAUFORT; SURVITECZODIAC; SURVITEC SURVIVAL PRODUCTS; REVERE.  (*See* Docket Entry No. 76 at 5–7).  None of the claims succeed.

### A.        Unauthorized Trademark Use

"To recover on a claim of trademark infringement, a plaintiff must first show that the mark is legally protectable and must then establish infringement by showing a likelihood of confusion." *Am. Rice, Inc. v. Producers Rice Mill, Inc.*, 518 F.3d 321, 329 (5th Cir. 2008).  To prove infringement, the plaintiff must show that the defendant used (1) any reproduction, counterfeit, copy, or colorable imitation of a mark; (2) without the registrant's consent; (3) in commerce; (4) in connection with the sale, offering for sale, distribution, or advertising of any goods; (5) where such use is likely to cause confusion, or to cause mistake or to deceive.  *Id.*  "The elements in common law trademark infringement under Texas law are the same as those under federal trademark law."  *Hot-Hed, Inc. v. Safehouse Habitats (Scotland), Ltd.*, 333 S.W.3d 719, 730 (Tex. App.—Houston [1st Dist.] 2010, pet. denied).  Louisiana also borrows federal standards for trademark-infringement suits.  *See Seafood Rest. Servs., Inc. v. Bonanno*, 665 So. 2d 56, 60 (La. Ct. App. 1995) (citing *Falcon Rice Mill, Inc. v. Cmty. Rice Mill, Inc.*, 725 F.2d 336, 345 (5th Cir. 1984)); *AutoZone IP LLC v. Awad*, No. 17-cv-13107, 2018 WL 6591910, at *3 (E.D. La. Dec. 12, 2018).

18

Some of the plaintiffs' claims fail because Fire Protection did not use the marks in commerce.  The remaining claims fail because the plaintiffs did not prove that Fire Protection's use of the plaintiffs' marks entitles the plaintiffs to any damages.

### 1.   Unauthorized Use in Commerce

The evidence showed that after Survitec Group Ltd. terminated Fire Protection as an authorized dealer, Fire Protection continued to make limited use of the SURVITEC, ELLIOT, DSB, SURVITEC SURVIVAL PRODUCTS, and REVERE marks in commerce.  Fire Protection did not use the remaining marks on its website or in its brochure and line sheet, and the Coast Guard website does not constitute use in commerce under trademark law.  The plaintiffs cannot state a claim for Fire Protection's miscellaneous uses of their marks.

### i.   Brochure, Fire Protection Website, and Coast Guard Website

The plaintiffs showed that Fire Protection used their SURVITEC, ELLIOT, DSB, SURVITEC SURVIVAL PRODUCTS, and REVERE marks in commerce.  (Def. Dem. Ex. 1; Def. Dem. Ex. 2; 8/12 PM Tr. at 4:12–26:9).  Use of a mark on brochures, catalogs, or other public advertisements qualifies as use in commerce.  *See Dallas Cowboys Football Club, Ltd. v. Am.'s Team Props., Inc.*, 616 F. Supp. 2d 622, 633 (N.D. Tex. 2009); *Software Publishers Ass'n v. Scott & Scott, LLP*, No. 3:06-cv-0949, 2007 WL 92391, at *7 (N.D. Tex. Jan. 11, 2007).  But the plaintiffs offered no evidence that Fire Protection used their SURVITECZODIAC, BEAUFORT, OCEANMASTER, or SURVIVA marks in commerce.  Fire Protection's line sheet, brochure, and webpage did not list these trademarks.  (Def. Dem. Exs. 1, 2; Pl. Exs. 8, 9; 8/12 PM Tr. at 4:12–26:9).  Nor did the Coast Guard's webpage.  (Pl. Ex. 45; 8/12 PM Tr. at 20:16–26:9).

CREWSAVER and RFD were listed on the Coast Guard's webpage, but not on Fire Protection's website or in its brochure and line sheet.  The plaintiffs' claims as to this use fail

because the presence of these marks on the Coast Guard's website does not qualify as commercial use. Fire Protection did not report to the Coast Guard that either CREWSAVER or RFD authorized Fire Protection to service the branded life rafts "in connection with the sale, offering for sale, distribution, or advertising of any goods or services." 15 U.S.C. § 1114(1)(a). Federal regulations require a manufacturer's certification to obtain Coast Guard permission to operate as an "approved servicing facility." 46 C.F.R. § 160.151-41. The Coast Guard listed Fire Protection as an approved facility for CREWSAVER and RFD life rafts on its website because federal regulations require the Coast Guard to "maintain a current list of approved facilities" that may service life rafts. *Id.* § 160.151-51. Even though the Coast Guard continued this listing after Fire Protection was no longer an approved servicer for these life rafts, that is not use in commerce.

Just as a trademark application does not count as use in commerce, *see Southco, Inc. v. Fivetech Tech. Inc.*, 611 F. App'x 681, 693 (Fed. Cir. 2015); *Ballero v. 727 Inc.*, No. 16-cv-16098, 2017 WL 4226203, at *6 (E.D. La. Sept. 22, 2017); *Meyer v. Mittal*, No. 3:21-cv-00621-HZ, 2024 WL 385129, at *32 (D. Or. Feb. 1, 2024), neither does the Coast Guard's website. Both relate to a regulatory approval process and are not connected to the sale of goods or services. The Coast Guard does not accept payment for listing information on its website, does not accept payment for individuals' use of its website, and does not contain advertising or links to other commercial websites. *See TMI, Inc. v. Maxwell*, 368 F.3d 433, 437–38 (5th Cir. 2004); *Springboards to Educ., Inc. v. Houston Indep. Sch. Dist.*, 285 F. Supp. 3d 989, 993 (S.D. Tex. 2018). The presence of a mark on that website is not actionable, commercial use.

### ii.    Shipping Life Rafts and Reselling Certificates of Service

The plaintiffs also do not state claims for infringement based on Fire Protection's alleged miscellaneous    uses—shipping    life    rafts    and    reselling    servicing    certificates—of    the

20

SURVITECZODIAC, BEAUFORT, OCEANMASTER, SURVIVA, CREWSAVER or RFD marks. To the extent there is evidence of such use in the record, the first-sale doctrine privileges Fire Protection's use of these marks. *See Farouk Sys., Inc. v. Target Corp, Inc.*, No. H-06-1103, 2006 WL 2583449, at *2 (S.D. Tex., Sept. 6, 2006) (applying the first-sale doctrine to state and federal trademark claims), *aff'd*, 2008 WL 181130 (5th Cir. 2008).

The first-sale doctrine recognizes that "trademark law does not apply to the sale of genuine goods bearing a true mark, even if the sale is without the mark owner's consent." *Matrix Essentials, Inc. v. Emporium Drug Mart, Inc., of Lafayette*, 988 F.2d 587, 590 (5th Cir. 1993) (quoting *Shell Oil Co. v. Commercial Petroleum, Inc.*, 928 F.2d 104, 107 (4th Cir. 1991)). A "trademark owner cannot ordinarily prevent or control the sale of goods bearing the mark once the owner has permitted those goods to enter commerce" because "the rights of the trademark owner are exhausted once the owner authorizes the initial sale of the product under the trademark." RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 24 cmt. b (Am. L. Inst. 1995).

Under the first-sale doctrine, Fire Protection is not liable for selling life rafts that bear the plaintiffs' marks. A "distributor who resells trademarked goods without change is not liable for trademark infringement." *Polymer Tech. Corp. v. Mimran*, 975 F.2d 58, 62 (2d Cir. 1992). On this logic, a distributor who distributes a genuine good bearing a true mark as part of a sale, service, or related transport is not liable for infringement.

Testimony from Hansen, Survitec Group Ltd.'s corporate representative at trial, and the arguments by plaintiffs' counsel illustrate the difficulty with the plaintiffs' argument. When asked about the plaintiffs' position on whether Fire Protection could have sold Survitec-branded equipment, Hansen responded that Fire Protection could have resold Survitec-branded equipment but could not have used Survitec's marks to do so. (8/12 AM Tr. at 71:21–72:3). On cross-

examination, Fire Protection asked Hansen whether the plaintiffs would require Fire Protection to "have obliterated the[ir] trademark[s]" from life rafts or have sold them under different names, and Hansen rejected those suggestions. (*Id.* at 72:4–74:5). He acknowledged that use of the trademark in the sale of a Survitec-branded raft was inevitable after the raft entered commerce. (*Id.*).

Plaintiffs' counsel later suggested that, to avoid infringement, Fire Protection should have draped tarp over Survitec-branded life rafts that Fire Protection picked up from a ship and drove to a servicing facility in a truck bearing Fire Protection's name. (8/14 AM Tr. at 21:8–22:24). Plaintiffs' counsel argued that the rafts had to be covered to avoid suggesting to onlookers that Fire Protection had manufacturer and Coast Guard authorization to service Survitec-branded rafts. (*Id.*). This argument presents an absurdity that the first-sale doctrine is supposed to prevent. Under that doctrine, once a genuine good bearing a true mark enters the stream of commerce, the manufacturer's rights to control the distribution and sale of the good is largely "exhausted." RESTATEMENT, *supra*, § 24 cmt. b; *see Matrix Essentials*, 988 F.2d at 590 (recognizing that consumer confusion generally does not result from the distribution or sale of genuine goods bearing true marks); *Tumblebus Inc. v. Cranmer*, 399 F.3d 754, 766 (6th Cir. 2005) (same); *Davidoff SA v. CVS Corp.*, 571 F.3d 238, 243 (2d Cir. 2009) (same). In the absence of any credible evidence of confusion or harm supporting the plaintiffs' theory of infringement based on Fire Protection's transporting Survitec-branded rafts from ships to servicing facilities, the court "decline[s] to expand the reach of" trademark protections. *Matrix Essentials*, 988 F.2d at 591.

This same reasoning applies to Fire Protection's use of plaintiffs' marks on servicing certificates that it returns to customers along with their serviced life rafts. The servicing certificates are valid and authentic documents, created by life-raft manufacturers, including the plaintiffs, and sold to authorized service stations. (8/12 AM Tr. at 45:9–47:2). Federal regulations require their

22

use and prescribe their content and form.  *See* 46 C.F.R. § 160.151-57(p); (*see* 8/11 Tr. at 57:2–7; 8/12 AM Tr. at 15:9–16, 16:5–17:6, 23:12–24:9; *see also* Def. Ex. 59).  For this reason, the use of these certificates is not commercial use, just as with the U.S. Coast Guard's website.  And the evidence demonstrates that Fire Protection merely transferred to the customer a genuine good bearing the plaintiffs' true mark.  Under the first-sale doctrine, once Fire Protection's subcontractor properly services the life raft and completes the servicing certificate, Fire Protection is dealing with a Survitec-branded good that has entered the stream of commerce.  The plaintiffs have no basis to claim infringement based on this use of their marks.

### 2.    Consumer Confusion

The plaintiffs' claims as to the SURVITEC and SURVITEC SURVIVAL PRODUCTS marks fail because Fire Protection's use of them was not likely to, and did not, confuse consumers. However, there is some evidence that Fire Protection's use of the ELLIOT, DSB, and REVERE marks was likely to confuse consumers into believing that Fire Protection was authorized to perform service work on Survitec-branded rafts after Survitec had terminated that authorization.

"In deciding whether a plaintiff has demonstrated a likelihood of confusion, courts consider: (1) the strength of the trademark at issue; (2) similarity of design; (3) similarity of product; (4) identity of retail outlets and purchasers; (5) identity of advertising media used; (6) the defendant's intent; and (7) actual confusion."  *S & H Indus., Inc. v. Selander*, 932 F. Supp. 2d 754, 760 (N.D. Tex. 2013).  These factors are non-exhaustive and serves as a guide, not a determinative test, for assessing trademark infringement.  *Pebble Beach Co. v. Tour 18 I, Ltd.*, 155 F.3d 526, 546 (5th Cir. 1998), *abrogated on other grounds by TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23 (2001).  "The absence or presence of any one factor ordinarily is not dispositive; indeed, a finding of likelihood of confusion need not be supported by even a majority of the seven factors."

*Conan Properties, Inc. v. Conans Pizza, Inc.*, 752 F.2d 145, 150 (5th Cir. 1985) (citing *Armco, Inc. v. Armco Burglar Alarm Co.*, 693 F.2d 1155, 1159 (5th Cir. 1983)).  Courts must consider the likelihood of confusion in light of the circumstances of each case, including the potential defenses that bear on the likelihood of consumer confusion.  *See Lyons P'ship v. Giannoulas*, 179 F.3d 384, 389–90 (5th Cir. 1999) (explaining that court must consider the likelihood of confusion in light of a parody defense); *Pebble Beach*, 155 F.3d at 547 (same, with respect to nominative fair use).

The doctrine of nominative fair use and the first-sale doctrine inform the likelihood-of-confusion analysis.  Under the first-sale doctrine, a business can sell another's genuine good bearing a true mark.  *Matrix Essentials, Inc.*, 988 F.2d at 590.  Under the doctrine of normative fair use, a business may use another company's trademark to identify in advertisements the goods that it is selling, unless the business does so in a way that "implies affiliation with, sponsorship by, or endorsement by" the goods' manufacturers.  *Mary Kay, Inc. v. Weber*, 661 F. Supp. 2d 632, 646 (N.D. Tex. 2009) (citing *Bd. of Suprvs. for LSU v. Smack Apparel Company*, 550 F.3d 465, 489 (5th Cir. 2008)); *Nutradose Labs, LLC v. Bio Dose Pharma*, No. 22-CV-20780, 2023 WL 3645405, at *24 (S.D. Fla. May 25, 2023) (citing *Scott Fetzer Co. v. House of Vacuums Inc.*, 381 F.3d 477, 484 (5th Cir. 2004)).  As a result, Fire Protection is not liable for using the plaintiffs' marks on its website or in its brochure if doing so merely identifies the goods or services it offers.  *See Mary Kay, Inc.*, 661 F. Supp. 2d at 646 (explaining that a company may in some circumstances use another company's mark on advertising and purchase another company's mark "as a search term from search engines such as Google or Yahoo"); *Standard Process, Inc. v. Banks*, 554 F. Supp. 2d 866, 869 (E.D. Wis. 2008) (concluding that a website's use of another company's mark did not infringe because it did not confuse consumers into believing that there was an affiliation with the advertised goods' manufacturer); *Nutradose Labs, LLC*, 2023 WL 3645405, at *25

(similar). Fire Protection infringes the plaintiffs' trademarks, however, if its advertisements suggest that it is selling specific goods or services with the plaintiffs' endorsement.

Fire Protection's website, brochure, and line sheet are not likely to cause a consumer to believe that the plaintiffs have an association with, or endorse, Fire Protection. Fire Protection's line sheet places the plaintiffs' marks among about fifty others; the text on the side of the sheet states that Fire Protection both sells and services life rafts; and the sheet states that Fire Protection is the only manufacturer-authorized Viking service station in Texas. (Pl. Ex. 8). Fire Protection's brochure also includes long lists of manufacturers' brand logos whose goods Fire Protection sells. (*See* Pl. Ex. 9 at 4–5). And Fire Protection's website includes a long list of manufacturer names, as opposed to logos, whose goods Fire Protection sells. (Pl. Ex. 10 at 1). These types of crowded, list-based advertisements, with no other special indication of affiliation, are similar to the one at issue in *Scott Fetzer*, in which the Fifth Circuit held that no reasonable jury could find a likelihood of confusion as to affiliation. 381 F.3d at 486. In the advertisement at issue in that case, "'Kirby' [was] fifth in a list of thirteen brand names and [was] not especially prominent." *Id.* With no other evidence of actual confusion, a review of the advertisement effectively ended Scott Fetzer's infringement claim. *See id.* at 486–89. The court similarly finds no likelihood of confusion as to affiliation with respect to Fire Protection's brochure, line sheet, and website.

This case is distinct from *Scott Fetzer* in one respect, but the distinction does not make a difference. Because the life-raft industry is heavily regulated, a representation that Fire Protection services, as opposed to merely sells, Survitec-branded rafts comes with a consumer expectation that the service station has technicians certified by the manufacturer. Even considering this industry nuance, the line sheet, brochure, and website are not likely to confuse consumers as to affiliation. A consumer is unlikely to believe that Fire Protection has technicians certified by over

fifty brands. A review of the Coast Guard's list of certified service stations reveals that few service stations are certified by more than a handful of manufacturers. (*See* Def. Ex. 55). And Fire Protection expressly stated on its line sheet that it was a Viking-authorized service station, creating the inference that it was not manufacturer-authorized to service other brands. (Pl. Ex. 8). *Scott Fetzer*'s logic—that a crowded advertisement of many brands is unlikely to confuse consumers as to affiliation with any of them—controls. No reasonable consumer would believe that Fire Protection was affiliated with, or endorsed by, the plaintiffs based on the line sheet or the lists of manufacturers on Fire Protection's brochure and website.

The plaintiffs' failure to introduce evidence showing that Fire Protection's advertisements actually confused consumers confirms this finding. *See Old Chief v. United States*, 519 U.S. 172, 188–89 (1997) (explaining that finders of fact may draw inferences against parties who fail to introduce usual or expected evidence). The plaintiffs' witnesses on confusion, Babb and Bertram, testified only that they thought Fire Protection was affiliated with the plaintiffs because it accepted their requests to service Survitec-branded life rafts, not because of Fire Protection's use of the plaintiffs' marks. (8/12 AM Tr. at 25:16–26:13, 34:3–16; 8/13 PM Tr. at 15:11–22:9). This is not evidence of confusion; it is evidence that some consumers made faulty, and unwarranted, assumptions that Fire Protection was not subcontracting the servicing of some life rafts. The court does not credit the plaintiffs' evidence and instead draws a negative inference from it.

*Scott Fetzer* explains why this is a legally permissible inference. Scott Fetzer attempted to prove trademark infringement with testimony from customers who thought that House of Vacuums was an authorized dealer or an authorized repair shop because "customers assumed affiliation based on the fact that House of Vacuums sells—with the approval of Scott Fetzer—KIRBY-brand rug shampoos and like products." 381 F.3d at 487. The Fifth Circuit rejected that argument,

explaining that, to "prove infringement, Scott Fetzer must ultimately prove that a misleading representation by House of Vacuums, as opposed to some other source, caused a likelihood of confusion." *Id.* at 487. Here, as in *Scott Fetzer*, the plaintiffs cannot establish a "link" between Fire Protection's advertising and the scant evidence of confusion. *Id.* at 487 n.5. An erroneous and unreasonable consumer assumption is not actionable infringement. The fact that this is the strongest evidence of confusion that the plaintiffs introduced at trial generates an additional inference against finding a likelihood of confusion. *See Old Chief*, 519 U.S. at 188–89.

The plaintiffs' cited authorities are not to the contrary. (*See* Docket Entry No. 254 at 27). In *PGA*, the Professional Golfers Association proved infringement because, after the PGA terminated its association with a golf club, the club continued to use "PGA" in its name and customers went to the club thinking that their PGA membership enabled them to play at any time. *See Pro. Golfers Ass'n of Am. v. Bankers Life & Cas. Co.*, 514 F.2d 665, 670 (5th Cir. 1975). In *Burger King*, the Eleventh Circuit found infringement when a franchisee continued to operate a Burger King franchise after the franchise agreement ended because a "patron of a restaurant adorned with the Burger King trademarks undoubtedly would believe that BKC endorses the operation of the restaurant." *Burger King Corp. v. Mason*, 710 F.2d 1480, 1492 (11th Cir. 1983). The *McDonald's* case followed the same reasoning: the franchisee's continued operation of a McDonald's store confused customers into believing they were shopping at a genuine franchise when they were not. *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1310 (11th Cir. 1998). In each case, there was ample evidence to support a finding that the defendant's continued use of the marks generated the confusion and the injury. That causal connection is absent here.

There is one exception. On page seven of the brochure, the text and displayed logos represent that Fire Protection is authorized to service life rafts from DSB, Elliot, and Revere:

27

### Servicing Industry Since 1952







**DSB, Elliot, Revere, RFD-Surviva, RFD-Toyo, Viking.**
**\*\* FPS is the only Viking Services Station in Texas \*\***

### Facilities: Safety Equipment Services
• *Rafts – Immersion Suits – Lifejackets – Hydro Release Units*

(Pl. Ex. 9 at 19). This representation is likely to lead consumers to conclude that Fire Protection is affiliated with DSB, Elliot, and Revere because only service stations with technicians certified by manufacturers can service that manufacturer's life rafts. *See* 46 C.F.R. § 160.51-41(e) (requiring as a precondition of service-station approval that a technician "successfully completed the manufacturer's training"); (8/12 AM Tr. at 14:19–24). As a result, the plaintiffs have established technical infringement as to the DSB, ELLIOT, and REVERE marks.

### 3.    Injury and Damages

Although the plaintiffs have established technical infringement of the DSB, ELLIOT, and REVERE marks, the court concludes that they are not entitled to actual or statutory damages.

### i.    Actual Damages

An award of actual damages for trademark infringement is appropriate only if there is sufficient proof of monetary harm. *Maltina Corp. v. Cawy Bottling Co.*, 613 F.2d 582, 587 (5th Cir. 1980); *Burger King*, 710 F.2d at 1493–94. For the reasons explained in the findings of fact, the plaintiffs have not proved that Fire Protection's infringement harmed them. The plaintiffs

allege that Fire Protection gained or retained customers because those customers thought Fire Protection was authorized to service Survitec-branded life rafts. (*See* Docket Entry No. 254 at 11–15, 20–21). This premise, and the several theories of harm that flow from it, have no record support.

The first theory is that Fire Protection unjustly enriched itself with profits that would have gone to the plaintiffs had Fire Protection not implicitly represented that it was authorized to perform service work on Survitec-branded rafts, either through its limited use of the marks or by failing to disclose that it was outsourcing service work. This theory fails to support Survitec's claims.

First, Survitec has failed to identify any legal basis to require Fire Protection to disclose that it was outsourcing servicing work on Survitec-branded life rafts. Second, there is scant evidence, let alone credible evidence, in the record that, had Fire Protection disclosed that it was subcontracting service work on Survitec-branded life-rafts, customers would have taken that business elsewhere. Instead, there is evidence that, with the knowledge that Fire Protection was outsourcing, customers did not switch. (8/13 PM Tr. 26:5–19; *see* Pl. Ex. 60). There is also evidence explaining why customers did not switch. Fire Protection provided a quality service at a price that consumers paid without complaint. (8/12 PM at 103:16–108:18; 8/13 AM Tr. at 31:19–32:9; 8/13 PM Tr. at 32:15–33:19). Customers often must service life rafts from multiple manufacturers, making outsourcing likely, if not inevitable, because not every service station in the Houston area is authorized to, or capable of, servicing every life-raft brand. (*See* Def. Ex. 55). Customers also purchase non-Survitec-related goods or services from Fire Protection. (*See* 8/13 AM Tr. at 18:9–20 (explaining that a review of Fire Protection's invoices would require "pulling out any lines that are not affiliated with the third party raft service")). Outsourcing is common in

the industry, as noted above. The testimony from Babb and Bertram does not persuade the court to conclude that Fire Protection was required to disclose that it was outsourcing servicing work on Survitec-branded life rafts. As noted, the court gives their testimony little weight due to their apparent lack of personal knowledge of their organizations' transactions with Fire Protection.

Third, the plaintiffs have not presented or pointed to any credible evidence that they would obtain the customers for life-raft servicing work if those customers no longer used Fire Protection for such work. The plaintiffs authorized several other stations to service its life rafts, and there is no evidence that the business that Fire Protection allegedly would have lost would have gone to the plaintiffs. (*See* 8/11 Tr. at 100:18–101:9, 126:3–127:14; 8/13 PM Tr. at 4:9–6:1). Even if the plaintiffs established that they would gain some Fire Protection business, they offered no evidence quantifying how much Fire Protection business they might gain. The plaintiffs' damages expert conceded this point. (8/12 PM at 101:15–102:23). Further complicating the plaintiffs' proof of injury is the fact that Fire Protection used Survitec entities as subcontractors. (*See* Pl. Ex. 26 (email exchange of Fire Protection subcontracting work to Survitec Safety Solutions); 8/12 PM Tr. at 47:9–21 (discussing the same)). If Fire Protection had lost its customers, the plaintiffs could have lost the customers that Fire Protection had referred to it. Third-party service stations could have captured a greater proportion of the business that left Fire Protection. In other words, Fire Protection's subcontracting may have helped, rather than hurt, the plaintiffs' business.

The plaintiffs failed to establish by a preponderance of the evidence that they missed opportunities, lost profits, or suffered other harm to their business because Fire Protection serviced the plaintiffs' life rafts without disclosing that the service work was outsourced. Nor have the plaintiffs proved that Fire Protection unjustly gained or retained business, the profits from which ought to be disgorged. *See Maltina Corp.*, 613 F.2d at 584–87.

The plaintiffs' second theory is that Fire Protection damaged their goodwill by accepting servicing work for the plaintiffs' branded life rafts, outsourcing that work, and increasing the prices the customers paid to cover the prices that the third-party servicers charged Fire Protection for the servicing work. The plaintiffs alleged that this increase in the price caused consumers to believe that Survitec-branded rafts are more expensive. The record undermines this theory. Fire Protection charged its customers prices that were paid without protest. There is no evidence that Fire Protection charged more than other raft-servicing establishments for similar work, whether done in-house or outsourced. Although the plaintiffs argue that the servicing price could have been lower had Fire Protection not outsourced the work, the customers, including Babb and Bertram, testified that they had no issues with the price they paid Fire Protection or with the services that Fire Protection provided. Even if customers left Fire Protection to procure life-raft servicing in the first instance from a Survitec-authorized servicer, there is no evidence that the price customers associated with Survitec-branded rafts would decrease.[4] There is no evidence that Fire Protection's actions in any way harmed the plaintiffs' goodwill.

The plaintiffs' final theory of harm is that, by making it appear that Survitec-branded rafts were more expensive, Fire Protection made Viking rafts look more desirable and switched customers to them, decreasing the long-term sales and servicing profits that the plaintiffs would collect, including through the sale of servicing certificates, technician training, and replacement parts and equipment. (8/11 Tr. at 106:1–107:11). The plaintiffs' corporate representative, Hansen,

---

[4] Evidence in the record also undermines a finding that the plaintiffs' goodwill or reputation is particularly sensitive to pricing. For example, the plaintiffs do not control the price that its authorized service stations charge their customers or the profit margin the service stations may generate from servicing. (8/12 PM Tr. at 33:25–34:10). Vertical pricing arrangements are conventional and can have procompetitive effects. *See Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 889–92 (2007). If the plaintiffs were concerned about associating their brand with high prices, they could have contracted to limit the prices that the authorized service stations could charge. There is no record evidence that they did so.

31

testified that they lost market share because Fire Protection upcharged customers for work on Survitec rafts and switched customers from Survitec to Viking rafts. (*Id.* at 108:6–19).

The court rejects this theory, for two reasons. First, there is no credible evidence to support it. Hansen could not quantify any sales or service work that the plaintiffs had lost because of Fire Protection's failure to disclose that it was outsourcing service work on Survitec-branded rafts or the price it charged for such work. Hansen testified to a decline in the plaintiffs' market share in the sales and servicing of life rafts after Survitec Group Ltd. terminated Fire Protection as an authorized dealer and servicer in 2017, but he admitted that there could have been other causes of the purported decline in market share, including that new competitors had recently entered the market. (8/11 Tr. at 108:6–111:16). Hansen also conceded that he could not trace any change in the plaintiffs' market share to Fire Protection's limited use of Survitec marks, to Fire Protection's failure to disclose outsourcing, or to the prices Fire Protection charged customers for servicing Survitec-branded rafts. (*Id.*; *see also id.* at 118:21–119:4). There is no credible evidence that the plaintiffs lost any market share, much less that they lost market share because Fire Protection continued to accept Survitec-branded rafts for servicing without disclosing its outsourcing, or because of the prices Fire Protection charged. In addition, the plaintiffs did not compare the price of Viking-branded rafts and the servicing they needed to the price of Survitec-branded rafts and the servicing they needed. The plaintiffs ignore the fact that customers paid Fire Protection for the servicing work it arranged without complaint. The court cannot find, on this record, that the prices Fire Protection charged to service Survitec-branded rafts caused customers to switch to rafts made by Survitec's competitors.

Second, the plaintiffs do not control through contracts the prices that their authorized service stations can charge customers. (8/12 PM Tr. at 33:25–34:10). That means that even an

authorized service station could, without infringing on the plaintiffs' marks or violating any other obligation to the plaintiffs, raise the servicing prices on Survitec-branded rafts to influence customers to select other brands. Generally, switching customers from one brand to another is not improper business behavior; the law favors "competition among manufacturers selling different brands of the same type of product." *See Leegin*, 551 U.S. at 890 (explaining that the primary purpose of antitrust law is to promote "interbrand competition").

The plaintiffs did not tie this damages theory to their theory of trademark infringement. *See Scott Fetzer*, 381 F.3d at 487; *cf. Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013). They did not present any evidence that Fire Protection gained or retained customers by misrepresenting an affiliation with the plaintiffs. As discussed, the plaintiffs did not prove by a preponderance of the evidence, let alone introduce credible evidence suggesting, that Fire Protection gained or retained customers through page seven of its brochure. Although the record includes some evidence that Fire Protection customers changed from using Survitec-branded life rafts to Viking rafts, there is no evidence that this was traceable to any infringing use of Survitec's trademarks. (*See, e.g.*, 8/12 AM at 13:22–14:17 (discussing a situation in which a Fire Protection customer changed from an expiring Survitec-branded raft to a ready-to-go Viking raft because the customer's ship needed to leave port before the service on the Survitec-branded raft could have been completed); *see id.* at 77:18–78:7 (suggesting that this occasion was the only example of switching that the plaintiffs could provide)).

The plaintiffs have not proved that they suffered loss or that Fire Protection gained profits as a result of any trademark infringement on the part of Fire Protection. The plaintiffs cannot invoke compensatory remedies or disgorgement under federal law. 15 U.S.C. § 1117(a). Their

claims that depend on actual damage—here, their state-law claims and remaining claim on the unregistered REVERE mark—fail.

### ii.    Statutory Damages

Under the Lanham Act, a trademark owner may elect statutory damages instead of actual damages in cases involving the use of a counterfeit mark.  15 U.S.C. § 1117(c); *see Taylor Made Golf CO., Inc. v. MJT Consulting Grp., LLC.*, 265 F. Supp. 2d 732, 747 (N.D. Tex. 2003).  A plaintiff may receive "not less than $1,000 or more than $200,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just."  15 U.S.C. § 1117(c)(1).  But the mark must be "registered on the principal register in the United States Patent and Trademark Office for such goods or services sold, offered for sale, or distributed."  15 U.S.C. § 1116(d)(1)(B)(i); *see id.* § 1117(c) (referring to § 1116(d) to define the scope of actions under which statutory damages are recoverable); *see also id.* § 1127 ("A 'counterfeit' is a spurious mark which is identical with, or substantially indistinguishable from, a registered mark.").  The plaintiffs' remaining marks do not meet these requirements.

REVERE is not registered, and DSB is registered internationally but not in the United States.  (*See* Docket Entry No. 76 at 6–7).  Both marks are ineligible for statutory damages.

ELLIOT is registered, but the scope of the registration does not enable RFD Beaufort, its owner, to recover statutory damages.  ELLIOT is not registered for the infringing "services sold," 15 U.S.C. § 1116(d)(1)(B)(i)—life-raft servicing.  (*Compare* Docket Entry No. 59-8 at 1 (describing the SURVITEC mark as covering "servicing, modification and repair of life rafts . . . [and] installation of life rafts"), *with id.* at 9 (describing the ELLIOT mark as covering "IC 009: inflatable life rafts")).  Because the ELLIOT mark was used for a different good or service—the sale of life rafts—than the one at issue here—life-raft servicing—RFD Beaufort cannot recover

statutory damages. *See* 3 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 25:15 (5th ed. Sept. 2025) ("[T]he accused goods or services must be the same as those for which the plaintiff's mark is registered."); *Louis Vuitton Malletier, S.A. v. Akanoc Sols., Inc.*, 658 F.3d 936, 946 (9th Cir. 2011) (requiring, to establish counterfeiting, that "the genuine mark was registered for use on the same goods to which the infringer applied the mark"); *see, e.g.*, *Playboy Enters., Inc. v. Universal Tel-A-Talk, Inc.*, No. 96-cv-6961, 1998 WL 288423, at *4 (E.D. Pa. June 3, 1998); *Kaloud, Inc. v. Shisha Land Wholesale, Inc.*, No. 15-cv-3706, 2016 WL 7444600, at *2 (C.D. Cal. 2016), *aff'd*, 741 Fed. App'x. 393 (9th Cir. 2018). In addition, there is no evidence of any damage to the plaintiffs from Fire Protection's limited use of these marks.

*    *    *

Fire Protection's use of the plaintiffs' marks is likely to confuse consumers in only a very limited respect and only as to three of their marks. But the plaintiffs proved neither any actual damages nor the preconditions to recover statutory damages on any of their marks. Their infringement and unauthorized-use claims fail.

### B.    Trademark Dilution

"Trademark dilution is the weakening of the ability of a mark to clearly and unmistakably distinguish the source of a product." *Scott Fetzer*, 381 F.3d at 489 (citing 15 U.S.C. § 1127); *see Horseshoe Bay Resort Sales Co. v. Lake Lyndon B. Johnson Improvement Corp.*, 53 S.W.3d 799, 812 (Tex. App.—Austin 2001, pet. denied.). A business may dilute a trademark through "blurring or tarnishing." *Scott Fetzer*, 381 F.3d at 489 (citing *Westchester Media v. PRL USA Holdings, Inc.*, 214 F.3d 658, 670 n.12 (5th Cir. 2000)). "Blurring involves a diminution in the uniqueness or individuality of a mark because of its use on unrelated goods." *Id.* "Tarnishing" occurs when a trademark is "linked to products of shoddy quality, or is portrayed in an unwholesome or

unsavory context, with the result that the public will associate the lack of quality or lack of prestige in the defendant's goods with the plaintiff's unrelated goods." *Id.* (internal quotation marks omitted) (quoting *Hormel Foods Corp. v. Jim Henson Prods.*, 73 F.3d 497, 507 (2d Cir. 1996)).

The plaintiffs assert a tarnishing theory. They argue that Fire Protection's failure to disclose to customers that it was subcontracting the service work on Survitec-branded rafts gave customers the impression that Survitec-branded rafts were expensive. (8/11 Tr. at 100:24–101:9, 118:11–119:4; 8/12 AM Tr. at 8:6–9:11, 11:17–14:17). This dilution claims fails, for two reasons.

First, marks must be both registered and famous, not just distinct, to qualify for federal dilution protection. *See Bd. of Regents, Univ. of Texas Sys. ex rel. Univ. of Texas at Austin v. KST Elec., Ltd.*, 550 F. Supp. 2d 657, 673–79 (W.D. Tex. 2008). The plaintiffs cannot state a dilution claim for their unregistered marks. *See id.* at 674–75. And even for the plaintiffs' registered marks, they introduced no proof that those marks are famous. A mark is famous if "it is widely recognized by the general consuming public of the United States." 15 U.S.C. § 1125(c)(2)(A). "One of the major purposes of the TDRA was to restrict dilution causes of action to those few truly famous marks like Budweiser beer, Camel cigarettes, Barbie Dolls, and the like." *KST Elec.*, 550 F. Supp. 2d at 679 (cleaned up). The plaintiffs have not introduced evidence that establishes that their marks have achieved this level of fame. Their claims can only proceed under state law, which permits relief to owners of distinctive marks. *See Scott Felzer*, 381 F.3d at 489 n.7 (citing *Express One Int'l, Inc. v. Steinbeck*, 53 S.W.3d 895, 899 (Tex. App.—Dallas 2001, no pet.)); *Gulf Coast Bank v. Gulf Coast Bank & Tr. Co.*, 652 So. 2d 1306, 1312 (La. 1995).

Second, the plaintiffs did not prove that Fire Protection's acceptance of requests to service Survitec-branded rafts or Fire Protection's outsourcing of that work in any way tarnished the plaintiffs' goodwill or reputation. Fire Protection provided a service at a price that consumers paid

without complaint.  (8/12 PM at 103:16–108:18; 8/13 AM Tr. at 31:19–32:9; 8/13 PM Tr. at 32:15–33:19).  The plaintiffs did not introduce evidence that Fire Protection charged exorbitant prices for servicing life rafts bearing the plaintiffs' marks.  The fact that Fire Protection profited from work that it subcontracted did not harm the plaintiffs' brand or reputation.  The fact that the plaintiffs did not control the prices that even authorized service stations could charge to service Survitec-branded life rafts, (8/12 PM Tr. at 33:25–34:10), further weighs against any finding that Fire Protection charged prices that tarnished the plaintiffs' reputation.

The plaintiffs failed to prove their trademark-dilution claims.

### C.    False Designation of Origin; Reverse Passing Off

"Reverse passing off" occurs when a business "misrepresents someone else's goods or services as his own."  *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 28 n.1 (2003); *see also Roho, Inc. v. Marquis*, 902 F.2d 356, 359 (5th Cir. 1990).  Unlike other trademark-infringement claims, "reverse passing off does not directly threaten the reputation of another since by definition the misrepresentation acts to sever the actual producer's association with the goods or services marketed by the actor."  RESTATEMENT, *supra*, § 5 cmt. a.  "Similarly, it cannot be said that the actual producer is subject to a direct diversion of trade in the usual sense since it has already sold the very goods at issue."  *Id.*  The traditional concern in a reverse-passing-off case is that the actor "misrepresent[s] the relative capabilities or accomplishments of the parties, thus creating the likelihood of a future diversion of trade to the actor."  *Id.*  As a result, liability attaches "only if the actual producer can establish both the fact of a misrepresentation and a likelihood of harm to its commercial relations."  *Id.*  These principles pose three problems for the plaintiffs.

First, most of the plaintiffs do not have standing to bring a reverse-passing-off claim.  Survitec Survival Products and Survitec Safety Solutions are the only entities that Fire Protection

appeared to use as a subcontractor and whose servicing work Fire Protection allegedly passed off as its own.  The harm that the other plaintiffs allegedly suffered sounds in traditional trademark-infringement claims, which the court has already rejected.  *See id.* (cautioning against claims "that may result from the use of goods produced by another . . . as a sample or illustration of proffered goods actually produced by the actor," which "result in confusion of source in the traditional sense" and do not fall "within the scope of" a reverse-passing-off claim).

Second, the plaintiffs have not proved that Fire Protection "passed off" outsourced servicing work as its own.  "The case law does not recognize an affirmative duty on the part of a seller to disclose the identity of the manufacturer or producer of goods offered for sale; liability is imposed only on the basis of an express or implied misrepresentation that the goods have been produced by the actor or a third person."  *Id.* § 5 reporter's note to cmt. b; *see id.* § 5 cmt. b, illus. a; *Roho, Inc.*, 902 F.2d at 360–61.

The record includes no affirmative representations by Fire Protection to customers that it did the servicing work on Survitec-branded life rafts in-house.  The plaintiffs proffered two witnesses—Babb and Bertram—who testified that they assumed that Fire Protection itself serviced the Survitec-branded life rafts simply by accepting the requests to service and by issuing invoices for the service work.  (8/13 PM Tr. at 15:11–22:9; 8/13 AM Tr. at 28:23–29:17).[5]  The credibility and probative value of this testimony is undermined, however, by the fact that Fire Protection always provided its customers with the servicing certificates that clearly identified the entities that serviced the Survitec-branded rafts.  (8/11 Tr. at 55:14–56:19, 95:20–96:14, 111:17–22; 8/12 AM

---

[5] The plaintiffs also proffered as an expert Gerald Nielsen, but the court largely excluded his expert opinions, (Docket Entry No. 74), and limited his testimony on the subject as cumulative and beyond his personal knowledge, (8/13 PM Tr. at 42:15–47:11).  Also for these reasons, the court does not credit his limited amounts of admissible testimony.

Tr. at 15:9–18:4; 8/13 AM Tr. at 26:4–13; 8/13 PM Tr. at 27:7–32:13; 8/14 AM Tr. at 43:18–44:16).  Customers are required to maintain these certificates to track their rafts' expiration dates and to ensure that they do not allow their life rafts to expire.  Customers review these certificates to ensure that they show that the life rafts are properly serviced and to log the date of inspection so that the life raft is serviced again at the proper time.  (8/13 PM Tr. at 27:7–32:13).  The service station name and number are conspicuously next to the date of inspection:

| Date of inspection: 02-May-2020 | Service Station name and No. 51090: Donovan Marine Inc New Orleans | Date issued to ship: 03-May-2020 |
|---|---|---|
| National Marine authority ID No. USCG 233 | Remarks/modification: GAS INFLATION; HOSES CHANGED; CYLINDER SERVICED | |

(Def. Ex. 59 at 1; *see* 8/13 PM Tr. at 27:7–32:13).  A Fire Protection customer would immediately know that a subcontractor—in this example, Donovan Marine—serviced the rafts.  There is no evidence that Fire Protection affirmatively represented a subcontractor's work as its own.  The service certificates that Fire Protection delivered to its customers show the subcontractor that did the work on Survitec-branded rafts.

Third, the plaintiffs did not prove a likely commercial detriment.  In a subcontracting situation such as this one, there is a stronger presumption that the subcontractor "implicitly consented to sales under the seller's trade name or trademark."  RESTATEMENT, *supra*, § 5 cmt. c.  The plaintiffs did not attempt to protect its commercial interests through contractual arrangements with Fire Protection, (8/11 Tr. at 115:23–116:7; 8/12 PM Tr. at 47:9–21; 8/13 PM Tr. at 5:10–7:14), as it did with other third-party servicers of its life rafts, (*cf.* 8/13 AM Tr. at 81:9–88:20 (discussing the plaintiffs' contractual arrangements with other third-party service stations)).  The plaintiffs sent to Fire Protection and its customers certificates that identify Survitec Survival

Products as the station that did the servicing work.  (*See, e.g.*, Pl. Ex. 26; Def. Ex. 26).  Those

certificates even included special stamps to clearly mark that a Survitec entity serviced the raft:



(Def. Ex. 26 at 2).  The plaintiffs failed to prove that Fire Protection had any duty to disclose the

outsourcing relationship to customers or that they were harmed by Fire Protection's failure to do

so.

The plaintiffs did not prove their reverse-passing-off claim.

### D.    False or Misleading Advertising

Last, the plaintiffs assert a false or misleading advertising claim under federal trademark

law and state law.  *See* 15 U.S.C. § 1125(a)(1)(B); *Morice v. Hosp. Serv. Dist. #3*, 430 F. Supp. 3d

182, 215–16 (E.D. La. 2019) (discussing Louisiana's ban on deceptive trade practices); *U.S.

Sporting Prods., Inc. v. Johnny Stewart Game Calls, Inc.*, 865 S.W.2d 214, 217 (Tex. App.—Waco

1993, writ denied) (discussing Texas's ban on deceptive trade practices).  To prove a false-

advertising claim under federal trademark law, a plaintiff must establish that: "(1) the ads of the

opposing party were false or misleading, (2) the ads deceived, or had the capacity to deceive,

consumers, (3) the deception had a material effect on purchasing decisions, (4) the misrepresented

product or service affects interstate commerce, and (5) the [plaintiff] has been—or is likely to be—

injured as a result of the false advertising." *Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1247 (11th Cir. 2002) (citing *ALPO Petfoods, Inc. v. Ralston Purina Co.*, 913 F.2d 958, 964 (D.C. Cir. 1990)). "The failure to prove the existence of any element of the prima facie case is fatal to the plaintiff's claim." *Pizza Hut, Inc. v. Papa John's Int'l, Inc.*, 227 F.3d 489, 495 (5th Cir. 2000).

Because the plaintiffs seek monetary damages, they must prove that any false statements that Fire Protection made "actually deceived consumers." *Id.* at 502 n.12 (emphasis omitted) (citing *Balance Dynamics Corp. v. Schmitt Indus., Inc.*, 204 F.3d 683, 690 (6th Cir. 2000)). Even "literal falsity, without more, is insufficient to support an award of money damages to compensate for marketplace injury such as harm to goodwill." *Balance Dynamics*, 204 F.3d at 693. A plaintiff may skip proof of actual damages only "in cases of intentionally false comparative advertising 'where [it is] reasonable to presume that every dollar [the] defendant makes has come directly out of [the] plaintiff's pocket.'" *Retractable Techs., Inc. v. Becton Dickinson & Co.*, 919 F.3d 869, 880 (5th Cir. 2019) (quoting *TrafficSchool.com, Inc. v. Edriver Inc.*, 653 F.3d 820, 831 (9th Cir. 2011)).

That rule "does not apply here." *Id.* There are multiple players in the life-raft service market. It cannot be "presume[d] that any benefit [Fire Protection] gained from its false advertising came directly at the expense of [the plaintiffs]." *Id.* As the court has discussed at length, there is no credible evidence that customers contracted with Fire Protection to service Survitec-branded life rafts because Fire Protection failed to change its brochure after the termination to remove the statement that it was an authorized service station for DSB, ELLIOT, and REVERE. Disgorgement of profits is inappropriate because there is no credible evidence that Fire Protection was unjustly enriched. *See Balance Dynamics*, 204 F.3d at 694 (denying monetary

relief in the absence of "evidence that its goodwill was harmed, or that customers were actually deceived by its advertisement"); *Castrol, Inc. v. Pennzoil*, 987 F.2d 939, 941–43 (3d Cir. 1993) (affirming the trial court's decision denying monetary relief despite a finding of literal falsity); *cf. BASF Corp. v. Old World Trading Co.*, 41 F.3d 1081, 1085–88 (7th Cir. 1994) (upholding an award of monetary relief for literally false statements based on proof that the defendant "was able to adopt lower prices because of its false advertising; that some private label business left [the plaintiff] and went to [the defendant]; [and] that these customers would not have gone to [the defendant] had they known the truth").

Even if there was some evidence that Fire Protection profited from the brochure's false statements—or any other potentially misleading aspect of its brochure, line sheet, website, or commercial activity—there is no evidence identifying the amount of those profits attributable to those statements.  The plaintiffs' damages expert attempted to calculate Fire Protection's profit margin on subcontracted servicing; he did not perform any causation analysis.  (*See* 8/12 PM Tr. at 86:19–88:18 (calculating the number of instances of outsourcing and Fire Protection's profits from that outsourcing, and assuming that the plaintiffs are entitled to all these profits); Docket Entry No. 254 at 33 (requesting a complete disgorgement remedy)).  The court cannot award damages without "a reasonable basis for computation."  *Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1407–08 (9th Cir. 1993) (collecting cases), *abrogated on other grounds by SunEarth, Inc. v. Sun Earth Solar Power Co.*, 839 F.3d 1179 (9th Cir. 2016).  There is no such basis in the record.

The plaintiffs have failed to prove their false-advertising claims.

## III.    Costs and Fees

Although the court will award costs to the prevailing party, Fire Protection, Fed. R. Civ. P. 54(d)(1), it declines to award attorney's fees, 15 U.S.C. § 1117(a).    Attorney's fees are

appropriately awarded to a litigant who prevails over parties who engaged in exceptional, highly culpable conduct. *Martin's Herend Imports, Inc. v. Diamond & Gem Trading USA, Co.*, 112 F.3d 1296, 1305 (5th Cir. 1997). For an infringing defendant, exceptional cases include malicious, fraudulent, deliberate, or willful misconduct. *Id.* For a losing plaintiff, exceptional cases include those that are "groundless, unreasonable, vexatious, or pursued in bad faith." *Matrix Motor Co. v. Toyota Motor Sales, U.S.A., Inc.*, 120 F. App'x 30, 31 (9th Cir. 2005) (citing *Stephen W. Boney, Inc. v. Boney Serv. Inc.*, 127 F.3d 821, 825–27 (9th Cir. 1997)). The plaintiffs showed technical and minor infringement, but no damages. Fire Protection continued to distribute brochures and advertisements that contained inconspicuous representations that it was an authorized servicer of some of the plaintiffs' life rafts after that relationship terminated. The plaintiffs failed to prove that those representations were deliberate, willful, fraudulent or malicious; that those representations harmed them; or that they are entitled to actual or statutory damages. This is not an exceptional case that warrants an award of attorney's fees. *See* 15 U.S.C. § 1117(a).

IV.    **Conclusion**

The plaintiffs have failed to prove any of the counts in their Second Amended Complaint. (Docket Entry No. 47; *see also* Docket Entry No. 76 (Joint Pretrial Order)). The court denies as moot the parties' motions for summary judgment. (Docket Entry Nos. 50, 58). A final judgment in Fire Protection's favor, dismissing the plaintiffs' claims, will be separately entered.

SIGNED on September 30, 2025, at Houston, Texas.

Lee H. Rosenthal
Senior United States District Judge